[Crim. No. 8116. Second Dist., Div. Four. Oct. 24, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. CLELLAND L. MARTIN et al., Defendants and Appellants.

Kenneth Foley and Taylor, Sherman & Heller for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, P. J.—Defendants Clelland L. Martin, LaVerne Rauh and Joseph Stonehouse were jointly charged by indictment of the Grand Jury of Los Angeles County in 29 counts, certain of which charged the defendants with issuing checks without sufficient funds, others with grand theft, forgery and conspiracy. A jury found the defendants Martin and Rauh guilty on all counts as charged and acquitted defendant Joseph Stonehouse. Probation was denied and defendants were sentenced to state prison, sentences on all counts to run concurrently with each other. Defendants Martin and Rauh appeal from the judgments of conviction and purportedly appealed from the order of the court of January 5, 1962, denying their motions for new trial.

Defendant Martin was the sole owner of an automobile agency known as "Martin Motors" in Compton, California. Defendant Rauh was the general manager of the business and the acquitted defendant Joseph Stonehouse was the sales man-

ager. Martin maintained a checking account for his business in the Compton branch of the Bank of America. This account was opened October 27, 1959, and closed May 6, 1960. After April 25, 1960, Martin Motors was financially unable to continue and was no longer in business.

Martin Motors financed its car purchases with Universal CIT Corporation (CIT) in Inglewood under an over-all flooring contract covering the sales of both new and used automobiles. Under the contract CIT would finance the purchase of and take title to the cars until they were paid off.

The People's evidence relating to Count I, the conspiracy count, Counts II and IV, issuing checks without sufficient funds, and to Counts III and V, grand theft, may be summarized as follows:

On the 14th of April 1960 the sales manager of Martin Motors called the sales manager of another automobile agency and requested a dealer trade of one Rambler automobile for a different model of the same car. The other agency agreed to the trade, issued its check payable to Martin Motors for the car being purchased, and the bill of sale covering the car being traded by it. The check issued to Martin Motors was deposited in its account. The automobile delivered by the other agency was immediately put on the flooring contract by Martin Motors and financed by CIT. Martin Motors in turn issued a bill of sale of the car it traded and its check to the other agency. The latter check was returned unpaid by reason of insufficient funds in the Martin Motors account on which it was drawn. Defendant Rauh advised the bookkeeper of the other agency that the check did not clear because the bank had confused the accounts and asked that it be put through a second time. However, the check was again returned by the bank unpaid.

On April 18 a similar dealer trade was made of automobiles between Martin Motors and the same automobile dealer and again cars and checks were exchanged with the same results; Martin Motors collected a good check in exchange for a bad one.

In proof of Counts VI through XVII, the People's evidence disclosed similar dealer trades between Martin Motors and other automobile agencies.

The People's evidence on Counts XVIII, XIX and XX involved a rather complicated dealer trade whereby another Rambler agency delivered a car that Martin Motors wanted together with invoice and bill of sale in exchange for a check

issued by the latter. Martin Motors sent a car together with invoice and bill of sale in exchange to the other agency and received a check covering that car. When it arrived the other agency was not satisfied with the condition of the car that it had received in the trade. Accordingly, it issued new papers and sold the car back to Martin Motors. In exchange for this rejected car the other agency got a new car from Martin Motors for which they issued a second check. Two checks were also received from Martin Motors, one for the new car furnished by the other agency and the other for the replacement for the rejected car. Both Martin Motors' checks failed to clear, whereas they collected on the checks issued by the other agency.

With respect to Counts XXI through XXIV, inclusive, Martin Motors completed two additional dealer trades on April 21, exchanging bills of sale, invoices and checks as had been done on the other occasions with the same results. On one of the cars involved in these counts no trust receipt was signed by Martin Motors disclosing to CIT that the car had already been sold by it with the result that CIT was never paid for that car. CIT charged it off to loss.

Counts XXV through XXIX concerned a dealer trade of foreign import cars which was handled in the same general manner that the cars in the other dealer trades had been handled and with the same results. However, no bills of sale accompanied delivery of the four cars being received from the other agency by Martin Motors. Four bills of sale were made out by Martin Motors and when delivered to CIT contained a purported signature of a representative of the other agency. However, the other agency denied ever having seen the bills of sale or ever having authorized anyone to execute them. Relying on the bills of sale CIT floored the cars for Martin Motors.

Defendant Rauh admitted that the bills of sale had been made up by her or under her direction and acknowledged that she had signed the trust receipts transferring the four automobiles in trust to CIT with the bills of sale attached. She stated that she could have signed the bills of sale but couldn't remember that she did do so; that if she did sign them she was instructed by some one to do so. A handwriting expert testified that he could not give a firm opinion that the writing involved in the signatures to the bills of sale was her handwriting.

The evidence showed that it was a practice of Martin Motors

to execute bills of sale for other agencies on cars being sold to them upon verbal authorization from representatives of the other agencies, which was usually secured over the telephone.

The transactions in the specific charges referred to above were dealer trades wherein a new car dealer trades automobiles with another new car dealer in order to satisfy a customer demand for a particular type of car or to maintain a balanced inventory.

The acquitted defendant Stonehouse was sales manager until April 16, 1960, at which time he was succeeded by Mr. Emery. Stonehouse testified that in January 1960 he had a discussion with defendant Martin in which he suggested that Martin go out and borrow operating capital and cut out his dealer trades; Martin stated he had to have these dealer trades in order to raise money. Defendant Rauh testified that she discussed with Martin the fact that their checks were being returned unpaid for insufficient funds; he told her to keep up the dealer trades. Defendant Martin testified that Stonehouse had stated to him he was going to try to cut down dealer trading and that he, Martin, asked Stonehouse not to do so; that he needed the trades and that any trades that came in he wanted to accept.

The evidence discloses that Martin Motors, acting through defendants Martin and Rauh by the issuance of checks in amounts in excess of funds on hand, was overdrawn in a total sum of $276,000 by the end of March 1960. Faced with a hopeless financial situation, the defendants attempted to secure funds to keep the business going at the expense of those who were transacting business with them, mainly through the method of dealer trades. In making these trades, Martin Motors would issue checks which at the time of their issuance they knew were not covered by sufficient funds in their account. The bank would give them credit on the checks they received from other dealers at the moment of their deposit under an arrangement whereby the bank would charge Martin Motors interest at 4 or 4½ per cent on the so-called "float." This float was in fact a temporary loan of the bank's money to Martin Motors to cover the two or three days that would normally be required for the bank to collect on the checks from the other dealers from the date of deposit to the date of collection. In their last few days of operation the bank refused to give immediate credit to Martin Motors on certain checks whose value they began to question. The number of dealer trades was constantly being increased, thus supplying

a continuous deposit of good checks in the Martin Motors account, and even though an increasing number of Martin Motors checks to the dealers were not being paid the appearance was given to their finance company, CIT, that they were conducting a responsible and profitable business. Financial statements prepared by their accountants which disclosed overdrafts were altered, under the direction of Martin and Rauh, to conceal these overdrafts. These financial statements were furnished to CIT and to American Motors, the manufacturer of Rambler automobiles, Martin Motors' principal source of supply.

Both Martin and Rauh admitted that they knew they were drawing checks against an account in which there were insufficient funds. When the checks to dealers started bouncing the dealers would be advised that there was some confusion in Martin Motors' bank accounts and to redeposit the checks a second time. In these transactions many persons were defrauded, numerous automobiles were acquired from other dealers without being paid for, and upon acquisition would be immediately put under flooring contract by CIT with the money thereon being advanced to Martin Motors. Having obtained a good title for the cars from the other dealers, albeit fraudulently, Martin Motors immediately passed title in trust to CIT thereby making it impossible, at least without a lawsuit, for the other dealers to reacquire title to their automobiles. When this "house of cars" collapsed CIT promptly moved in and took possession of all the automobiles under flooring contracts but not without sustaining a substantial loss.

Basically, defendants Martin and Rauh seek to escape conviction for issuing checks without sufficient funds upon the theory that it did not constitute a violation of section 476a of the Penal Code to issue a check at a time when Martin Motors had a credit arrangement with its bank under which such checks would be paid by the bank. The bank officer in charge of supervising the Martin Motors account categorically denied that there was any arrangement whereby checks would be paid if they exceeded the balance credited to the account or that there was any arrangement for credit. ■■ The only arrangement with the bank was the one whereby it would give Martin Motors immediate credit in its account upon the deposit in the account of valid checks and charge interest on a monthly basis to Martin Motors for the period of time it took the bank to collect such checks. This is certainly not an arrangement for credit which would meet the requirements of section 476a

of the Penal Code. In fact, for many months, under the method of operation of Martin Motors both under its Bank of America account and even prior to that date under its former bank account with another bank, it was the custom for the bank to notify Martin Motors every morning around 10 o'clock of the total amount of checks presented for payment that morning at the bank in excess of the amount of money on deposit at that time in the Martin Motors account. Martin Motors would then have until 3 o'clock that afternoon within which to make a deposit sufficient to meet the overdraft. If the deposit was not sufficient, then the following morning the bank would return the unpaid checks to the banks presenting them for payment. Thus it can be seen that there was no arrangement under which any check of Martin Motors would be paid unless by the close of the day of its presentation Martin Motors made a deposit to cover it. On some occasions the telephone call in the morning would indicate an overdraft as high as $90,000 was apparent and Martin Motors would have until 3 o'clock that afternoon to deposit that amount. The clear intent on the part of defendants Martin and Rauh to cheat and defraud by criminal means and to obtain money and property by false pretenses is indicated by the extremes to which these defendants went in order to make it apparent to the bank they were depositing sufficient funds in the account to meet the required deposit and thus avoid the return of their worthless checks.

On April 16, 1960, defendant Martin exchanged checks for $7,500 with his new sales manager, Mr. Emery. Emery admitted that he knew his account did not have sufficient funds to cover these checks. Martin certainly knew he was in financial distress and both his checks to Emery and Emery's check to Martin Motors were returned unpaid.

On April 14 Emery gave Martin his check for $4,000 and in return Martin gave a Martin Motors check for $4,401.68 to Emery in an apparent attempt to conceal the transaction as a car purchase transaction. At the time of this exchange Emery had $8.15 in his bank account. On April 15 Martin gave Emery two checks amounting to $5,840. The checks were given to ''Harry Mabe Used Cars'' and both of the checks were apparently endorsed in that form. Martin asked Emery to deposit them in Emery's account which he did and they were paid to Emery's account although it was admitted by Emery that no such amount was owed to him. Martin admitted he endorsed the name of Harry Mabe Used Cars on the checks in his own handwriting. Martin further admitted that either

he or defendant Rauh wrote the signature of Harry Mabe on at least two other checks.

Martin attempted the sale of his Renault dealership for $25,000 to a David McGuire. McGuire paid Martin $17,500. He gave Martin a check for the balance in the amount of $7,500 and then stopped payment on this check. McGuire then made a demand upon Martin for the $17,500 that he had paid. Martin "refunded" McGuire with three checks in the total amount of $17,500, all of which failed to clear the bank. McGuire's checks did clear the banks and were paid to the Martin Motors account.

Defendant Rauh deposited a personal check for $700 in the Martin Motors account at a time when she admitted her own account in another bank was not sufficient to cover the check. On another occasion Martin deposited two of his ex-wife's checks in the sum of $9,500 to the Martin Motors account. He admitted he knew his ex-wife did not have the money in the bank to make the checks good.

It is obvious these transactions were but desperate attempts to conceal from the people with whom Martin was doing business that he was in fact hopelessly bankrupt. Further evidence of his state of mind was his flight on Sunday, April 24, the day before the business closed. He went to Las Vegas and while there cashed checks for $1,500 on the Martin Motors account. He kept this amount and used $350 of it to pay the services of an attorney. He then drove to Oklahoma City with his sales manager Emery and remained there for approximately two weeks. Before he left for Oklahoma City he had his son clear through his personal account a number of checks that constituted proceeds from the business of Martin Motors in the total sum of approximately $3,000. He took this money with him to Oklahoma City. He testified this money was used to finance his bankruptcy. Defendant Rauh, when she learned the business was about to go under on April 25 went to the mountains for a couple of days.

On appeal defendants Martin and Rauh contend the sentences imposed upon them on each of the 29 counts for which they were convicted are invalid as being contrary to section 654 of the Penal Code; that the crimes in question for which they were convicted constituted "one aggravated offense" as charged in the conspiracy count and occurred between the 14th day of April 1960 and the 30th day of April of that year.

Conspiracy, however, is a distinct offense from the actual

commission of the offenses forming the object of the conspiracy. In *People* v. *Keene,* 128 Cal.App.2d 520, 529 [275 P.2d 804], the defendant was found guilty of 13 overt acts performed in pursuance of a conspiracy to forge checks. Sentences on certain counts of forgery of which he was also convicted were ordered to run concurrently to each other and consecutively with the sentence on conspiracy. It was held that conspiracy is a different crime from the substantive offense charged and that the imposition of sentences to run concurrently or consecutively, or both, was within the discretion of the trial judge. (See also *People* v. *Garcia,* 187 Cal.App.2d 93, 103-104 [9 Cal.Rptr. 493]; and *People* v. *Severino,* 122 Cal.App.2d 172, 184 [264 P.2d 656].)

 In the instant case the evidence was clearly sufficient to sustain both the charge of conspiracy and the charges of substantive offenses set forth in the other counts.

 Defendants next contend the crime of issuing a check without sufficient funds and the crime of grand theft do not constitute separate criminal offenses and thus they argue that the defendants should not have been convicted of two offenses in connection with each transaction whereby through the issuance of a fictitious check they defrauded an automobile dealer of money or an automobile. However, in *People* v. *Freedman,* 111 Cal.App.2d 611, 614 [245 P.2d 45], it is made clear that the offense of issuing a check without sufficient funds, in this instance to acquire airline tickets, is complete when the check is issued with intent to defraud even though no one may be defrauded thereby. The court declared: "Grand theft is a separate offense . . . which involves the element of loss or detriment. The former offense may be committed without committing the latter. The grand thefts were not committed by the same acts as were the offenses of issuing the checks. It is the singleness of the act which determines whether section 654 [of the Penal Code] applies. [Citations.] Obtaining the airline tickets were acts separate from the issuance of the checks with intent to defraud. Section 654 has no application." The same situation applies to the separate acts of defendants in the case before us in issuing bad checks and by that means defrauding the sellers and wrongfully obtaining possession of their property. Two separate crimes were committed in each instance.

 In *Neal* v. *State of California,* 55 Cal.2d 11, 18 [9 Cal.Rptr. 607, 357 P.2d 839], the court declared, "Punishment for two offenses arising from the same act is prohibited by the

constitutional and common-law rule against multiple punishment for necessarily included offenses [citation] and by Penal Code, section 654, which provides that 'An act or omission which is made punishable in different ways by different provisions of this code may be punishable under either of such provisions, but in no case can it be punished under more than one.' " The court pointed out that under this rule a person could not be punished for two offenses arising from the same act where one offense is a necessarily included offense in the other offense committed.

The court further noted that the proscription of section 654, Penal Code, against multiple punishment of a single act, however, is not limited to necessarily included offenses and thus, as was said in *People* v. *Knowles*, 35 Cal.2d 175, 187 [217 P.2d 1], "If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. . . . It is the singleness of the act and not of the offense that is determinative."

In the *Neal* case, *supra,* the court further stated (p. 19), "Insofar as only a single act is charged as the basis for the conviction, however, the defendant can be punished only once. [Citing case.] . . . Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."

Applying this rule to the facts in the case at bench, we believe that while two distinct offenses were committed in each transaction and therefore the defendants were properly convicted of each offense the provisions of section 654 preclude the court from imposing separate sentences for each offense since as we view the evidence the two offenses in each instance (issuing the checks with insufficient funds and grand theft) were incident to but one objective, the immediate obtaining of funds with which to cover previously issued bad checks.

While the facts in this case are similar to those presented to the court in *People* v. *Freedman, supra,* 111 Cal.App.2d 611, the issue raised in that case was confined to the question of whether one or two separate offenses had been committed

with no emphasis placed upon the question of double punishment for a single purpose course of criminal conduct. Under the application of the rule in the *Neal* case, *supra,* the defendants in the case at bench should not have been sentenced on each of the two offenses involved in each transaction. The trial court was fully aware of the complexity of this problem under section 654, and at the time of sentencing defendants noted under certain decisions the courts have indicated that the procedure of the trial court should be to sentence the defendant on the crime that carries the heaviest penalty and to dismiss the other. However, as the trial court pointed out, if it were to dismiss one charge and sentence defendants on the other, should there be a reversal on appeal on the charge on which they were sentenced, on retrial defendants could not be retried on the charge which had been dismissed.

In order, therefore, to protect the interests of the People the court imposed a like sentence on each charge with all of the charges to run concurrently with each other. In doing so the trial judge made it clear that he considered the two counts involved in each dealer trade (of issuing checks without sufficient funds and of grand theft) as constituting only one transaction. We concur in this view. The offenses involved in each transaction were incident to one objective and therefore the defendants should only have been sentenced for the offense which carries the heavier penalty.

The maximum penalty under section 476a, Penal Code, for issuing checks with insufficient funds is 14 years in state prison, whereas the maximum penalty for grand theft under section 489, Penal Code, is 10 years in state prison. Therefore the judgment of the trial court should be modified by striking out that portion thereof directing defendants be imprisoned for the offenses of grand theft as was done in the case of *People v. Brown,* 200 Cal.App.2d 111, 118 [19 Cal.Rptr. 36].

Defendants assert the evidence was insufficient to support the four counts of forgery of the bills of sale involved in Counts XXV through XXVIII. ■■ The crime of forgery does not require proof of who actually created the forged instrument since it also involves the making or alteration of a document without authority or the uttering (making use) of such document with intent to defraud. ■■ To constitute forgery by uttering or passing a forged instrument, as defined in section 470 of the Penal Code, three important factors are requisite: (1) It must be uttered, published, passed, or attempted to be passed, as true and genuine; (2) It must be

known by the person uttering or passing it to be false, altered, forged or counterfeited; (3) It must be with intent to prejudice, damage or defraud some person. (*People* v. *Hellman,* 189 Cal.App.2d 777, 778-779 [11 Cal.Rptr. 433].)

The proof of intention to defraud may consist of reasonable inferences drawn from affirmatively established facts. (*People* v. *Sinshiemer,* 182 Cal.App.2d 103, 109 [5 Cal. Rptr. 740].) The signing of the person's name without authority will imply the intent. (*People* v. *Weitz,* 42 Cal.2d 338, 350 [267 P.2d 295].)

Here, defendant Rauh knew bills of sale did not accompany the Triumph automobiles involved, admitted they were prepared in the office of Martin Motors, admitted she prepared the trust receipts transferring title of the cars to CIT with the four bills of sale attached and states she could have signed the bills of sale but did not recall if she did. There is no question but what the bills of sale were in fact forged by some one and that both defendants Martin and Rauh knew of their false nature. Defendant Martin was not directly connected with the actual forgery of these bills of sale. He did not handle them directly. However, it was clearly shown that both defendants were engaged in a conspiracy to defraud and under such circumstances the inferences are clear that these forged documents were used with an intent to defraud. As stated in *People* v. *Keller,* 124 Cal.App. 673, 676 [12 P.2d 1066], it was not necessary to produce evidence connecting the defendant directly with the actual acts of forgery. "Where the evidence produced at the trial reasonably tends to prove the existence of such conspiracy and the connection of appellant therewith, the acts of any one of the conspirators may properly be admitted as evidence against each member of the confederacy." (124 Cal.App. 673, 676.)

As a final argument defendants contend that a necessary element of conspiracy is an agreement to commit an offense prohibited by statute; that since defendants committed no substantive offenses the crime of conspiracy could not be proven. They admit that such argument has no validity if it is found they were properly convicted of substantive offenses, and of the latter there can be no doubt.

The judgments are modified by striking out that portion thereof directing defendants be imprisoned for the offenses of grand theft under Counts III, V, X, XII, XV, XVII, XX, XXII and XXIV and as modified are affirmed. The purported

appeal from the order denying motions for new trial is dismissed.

Jefferson, J., and Ford, J.,* concurred.

The petition of appellant Martin for a hearing by the Supreme Court was denied December 19, 1962.

---

*Assigned by Chairman of Judicial Council.