[Crim. No. 9309. Second Dist., Div. Three. June 17, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. SOL SIMON, Defendant and Appellant.

Sol Simon, in pro. per., Ziskind & Ross and David Ziskind for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

FILES, J.—This prosecution began with an indictment containing 13 counts, naming appellant and three other defendants who are not parties to this appeal. After a trial before the court sitting without a jury appellant was convicted only of the offense charged in count XIII, a violation of Penal Code, section 476a, in that he did on December 12, 1961, deliver to the Citizens National Bank a group of seven checks aggregating $11,800, drawn by the defendant Klotzman on the Bank of Las Vegas, without sufficient funds and for the purpose of defrauding the Citizens National Bank. The defendant Klotzman was convicted on seven counts, including count XIII. Defendant Ross, who was Klotzman's employee, was found guilty on three counts. Defendant Jerome Simon, who was appellant's son and part-time employee, was acquitted on all counts.

The sole subject of controversy on this appeal is the sufficiency of the evidence. This is a case in which there is room for a variety of inferences as to the knowledge and intent of the appellant at critical times. Appellant denied any criminal intent, and the prosecution was obliged to prove it by circumstantial evidence. ▮▮▮ Under the familiar rule of appellate review the credibility of the witnesses, the inferences to be drawn from the circumstances, and the weight of the evidence are all matters to be determined by the trial court, and its finding may not be disturbed by this appellate court if it can be supported by any reasonable hypothesis based upon the record. (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].)

At the time in question appellant was the sole owner of a

check-cashing business under the name of Burke's Payroll Check Service, Inc. He had been in this type of business for 15 years. Burke's was engaged in cashing payroll checks and other checks for individuals, and also cashing checks for companies which needed cash for payroll purposes. The fee charged for this service was one-half of one per cent of the face of the check. Prior to December 1961 Burke's maintained bank accounts at the Union Bank in Los Angeles, where it had an arrangement for credit up to $50,000. In the ordinary course of its business Burke's would borrow from the Union Bank every Friday the sum of $25,000, which was used to cash customers' checks over the week end and which was repaid to the bank by depositing the checks which Burke's received from its customers. Under the practice which had developed, the Union Bank gave Burke's immediate credit when the checks were deposited without waiting for the deposited checks to be collected from the drawee bank.

Klotzman was engaged in the handbill-distributing business in various parts of California and Nevada. He employed crews of casual laborers whose wages he paid in cash at the end of each day. Since Klotzman's customers usually did not pay him on the day the service was rendered, he was required to advance large amounts of cash. Klotzman carried on his business under the names of two corporations and one fictitious firm name. He maintained bank accounts in one or more of these business names at several banks, among which were the Bank of Las Vegas at Las Vegas, Nevada, the Community Bank at Huntington Park, California, and the Citizens National Bank, Echo Park Branch, in Los Angeles.

Appellant first met Klotzman in the early part of 1961, and thereafter Klotzman began to cash checks with Burke's in order to obtain cash for his operations. Commencing on November 22, 1961, an officer of the Union Bank had occasion to make an investigation concerning Klotzman and his companies. He noted the large volume of Klotzman checks which were going through the Burke's account. A study of this account was made over a period of several days. On Wednesday, December 6, appellant was called in for a conference with officers of Union Bank. The bankers told appellant very bluntly that in their opinion Klotzman was conducting a check-kiting operation. What the bankers meant by this was that Klotzman would draw a check on his Las Vegas account without sufficient funds and exchange the check for immediate cash at Burke's. The latter would then deposit the

check at the Union Bank and obtain immediate credit. Klotzman could then cash another check with Burke's and obtain more cash, which could be used to cover the first check by the time it had gone through the clearing house and had been received by the drawee bank in Las Vegas. By this device Klotzman could have the use of substantial amounts of money indefinitely provided he could keep cashing more bad checks and obtaining immediate funds so as to keep covering the past bad checks as they reached the drawee bank.

At the December 6 conference Union Bank officers confronted appellant with the fact that during the past three days Burke's had deposited $138,000 of Klotzman's checks, which had not yet had time to clear. Appellant had a balance of only $55,000 on deposit and hence the bank's potential loss was $83,000 if these checks failed to clear. Union Bank Vice President Dansby testified that he told appellant: "You are dead. How can you put all these checks through, expect all these checks to go through?" When appellant protested that Klotzman's checks had always been good, Mr. Dansby said, "Don't be naive; they couldn't use that much money in their business." Mr. Dansby testified, "Mr. Simon [appellant] seemed to think it wasn't a kite and I said I was sure it was a kite."

Mr. Dansby then told appellant that the Union Bank was closing his accounts and cutting off his credit. The $55,000 then on deposit was frozen and would be paid over to Burke's when the checks in transit had cleared.

The following day, Thursday, December 7, Klotzman suggested to appellant that a Burke's account be opened at the Citizens National Bank, Echo Park Branch. The two of them called upon Mr. Hausman, the branch manager, and talked to him after the bank had closed for the evening. Mr. Hausman testified that the two men told him that appellant was "tired of doing Union Bank's bookkeeping," and that he had $50,000 in his account at Union which would be transferred to Citizens next week. Nothing was said about the real reason for terminating with Union, or about the Union account being frozen. Appellant then opened the new account for Burke's Payroll Check Service, Inc., at Citizens with an initial deposit of $1,000. Appellant mentioned that his business occasionally required overnight loans and week-end loans, but no arrangement for credit was requested or made. Mr. Hausman understood that the normal operation of a check-cashing business required that it receive immediate credit for

checks deposited. Nothing was said about what dollar limit would be placed upon this privilege. Mr. Hausman testified that he expected to obtain a sizeable deposit account which would act as a cushion, and that the limit on immediate credit at any particular time for uncollected checks was "up to the manager."

On Friday, December 8, and Monday, December 11, approximately $119,000 was deposited in Burke's new account, and more than $113,000 was withdrawn. A substantial part of the deposits consisted of checks on Klotzman's various accounts. Except the initial deposit of $1,000 all of the deposits, made on December 8, 11 and 12, were made by Jerome Simon, appellant's son, and on each occasion he was accompanied by Felix Gil, who was employed by Klotzman. Jerome testified that he had nothing to do with the policies of the business, but acted entirely under the instructions of his father. On each occasion when he went to the Citizens bank he deposited whatever Klotzman checks had been given to him, then drew a check on the Burke's account payable to cash, cashed it, and turned over to Gil the entire proceeds of the Klotzman checks less the commission.

On Tuesday morning, December 12, Mr. Hausman telephoned appellant and told him "the Klotzman checks had bounced," and that somebody in the main office wanted to talk to him.

During that day Jerome Simon, accompanied by Gil, came to the bank and deposited in the Burke's account items totaling $39,518.96. This deposit included seven checks in the respective amounts of $1,595, $1,379, $1,847, $1,997, $1,886, $1,133 and $1,963, all drawn on the account of Golden Bear Distributing Service in the Bank of Las Vegas, which was one of Klotzman's accounts. This is the group of checks totaling $11,800 which is the basis of appellant's conviction. When Jerome Simon made the deposit he also presented a check on the Burke's account made out to "Cash" in the amount of $46,000. Mr. Hausman looked at the deposit ticket but did not examine the individual checks which made up the $39,518.96 deposit. He then approved cashing the $46,000 check, and the cash was delivered to Jerome. All of the checks in the $11,800 group were dishonored because of insufficient funds in the Las Vegas account.

Not only were the $11,800 worth of checks dishonored, but altogether a total of more than $70,000 of Klotzman's checks, negotiated through the Burke's account in the Citizens bank

on December 8, 11 or 12 were dishonored for lack of sufficient funds in the drawee banks.

Without detailing the evidence concerning Klotzman's operations, it is enough to say that there is not the slightest doubt that in December 1961, and for a considerable period before that, he had been operating on money obtained by issuing checks without sufficient funds. An analysis of bank accounts prepared by the district attorney's accountant for the period September 15, 1961, through December 7, 1961, traces some $2,373,403 from the Burke's account in the Union Bank to the Klotzman accounts in the three other banks. Of this total, more than $2,000,000 went through the Las Vegas bank. Klotzman's own testimony confirmed that during the period from September to December 1961 he had been writing checks on insufficient funds, cashing them at Burke's, and then carrying or wiring money to Las Vegas to cover checks in transit. Klotzman testified that at first he cashed very small numbers of checks with Burke's, then cashed more and more there because Burke's was accepting anything he would give them. Klotzman's testimony is that he used Burke's because he needed money and could not get it from the bank.

When the Union Bank froze the Burke's accounts on December 6, the effect was to interrupt the flow of cash and checks which was essential to maintain the "kite" or "float" which produced Klotzman's working capital. The opening of Burke's new account in the Citizens bank was a desperate attempt to create a source of immediate cash to cover outstanding checks. The attempt was partly successful to the extent that money obtained from Citizens covered some of Klotzman's obligations at the other two banks, but not to the extent of reestablishing the cycle.

 But proving Klotzman's guilt is only a part of the process of proving appellant's guilt. The crucial question here is whether appellant had such knowledge of what was going on that an intent on his part to defraud can be inferred from the fact of his participation. There can be no doubt that appellant understood that Klotzman was using Burke's check-cashing service as a convenient method of obtaining a kind of short term credit. Klotzman told appellant this was cheaper than factoring accounts receivable. This suggests, but does not compel, the inference that Klotzman was writing checks on insufficient funds. If appellant believed that Klotzman had adequate funds in his Las Vegas accounts, but

needed immediate cash in Los Angeles, there was nothing wrong with setting up a method by which Klotzman could receive quick cash on the Las Vegas checks. On the other hand, if appellant believed the facts to be as they actually were, he was a guilty participant. A review of the evidence demonstrates a number of circumstances which, taken together, support a reasonable inference that when appellant sent the $11,800 group of checks to the Citizens bank on December 12 he knew that the maker lacked sufficient funds. These circumstances include the following:

(1) Appellant was an experienced operator of a check-cashing service. He must have been well aware of the abuses to which such a service may be subjected. It is inferable that he recognized the implications of Klotzman's statement that Burke's was "cheaper than if I had factored my account."

(2) Appellant had been doing an extraordinary business with Klotzman for many months. During the period of November 1 to December 14, 1961, Klotzman's checks amounted to approximately 64 per cent of the volume of business done by Burke's. Just before the Union Bank closed the accounts, Burke's was cashing Klotzman's checks at the rate of $30,000 per day. It is improbable that a businessman will be wholly insensitive to the nature of the business done by so important a client.

(3) On December 6, 1961, the officers of the Union Bank told appellant very plainly what Klotzman was doing. While appellant might have discounted the opinion of the bankers at that time because of his confidence in Klotzman, he must have had this warning in mind as he observed further developments.

(4) When Klotzman and appellant went to the Citizens bank they deliberately misled the manager. They said appellant was dissatisfied with the Union Bank and thereby concealed the truth—that the Union Bank believed the business was a kite. Appellant led Mr. Hausman to believe that he had $50,000 cash about to be transferred, but did not disclose that this cash had been frozen to protect checks in the amount of $138,000 which the Union Bank management believed would not clear. This lack of candor with the Citizens bank does not, by itself, support an inference of intent to victimize the bank, but it is a circumstance consistent with such an intent.

(5) Klotzman's method of dealing with Burke's on December 11 and 12 is not explainable as a normal use of a

check-cashing service. Why would Klotzman use Burke's service when his employee Gil was going to his own bank to cash checks during regular banking hours? The record shows that on December 11 Jerome Simon deposited a total of 54 checks drawn on two of Klotzman's Las Vegas accounts aggregating $39,448. Each check was for less than $1,000. Jerome then made an immediate withdrawal from the bank and handed Klotzman's share to Gil, who had accompanied him to the bank. The same procedure was used on December 12, when the $11,800 group of checks was deposited. Why did not Gil present these checks directly to the Citizens bank and ask for cash? It is reasonable inference that Klotzman realized that his request for this much money would appear to be enough out-of-the-ordinary that even the complaisant Mr. Hausman would be likely to call Las Vegas to find out if the checks were good. On the other hand, a check-cashing service turns in volumes of small checks as a matter of routine business. The effective way to avoid suspicion was to write smaller checks and put them through the Burke's account. Whatever Klotzman's actual purpose was, it is certainly inferable that appellant realized that his service was being used during regular banking hours to negotiate checks which Klotzman could not cash at his own bank.

(6) Mr. Hausman told appellant on the morning of December 12 that "the Klotzman checks had bounced." Even if appellant had never suspected Klotzman before, he was now informed that what the Union Bank said would happen had happened. Nevertheless, following this report from Mr. Hausman, appellant included more Klotzman checks in the group which he sent to the Citizens bank that day. The trial judge observed at the close of the evidence that while he might entertain a reasonable doubt as to appellant's intentions with respect to all of the earlier transactions, he could not escape concluding that appellant knew exactly what he was doing when he passed the last $11,800.

Appellant makes the argument that the bank was not defrauded, and points to the remarkable carelessness or credulity of the manager, Mr. Hausman, who permitted the loss to occur. He relies upon such cases as *People* v. *Burnett*, 39 Cal.2d 556 [247 P.2d 828], which hold that there can be no conviction under Penal Code, section 476a, if the person who gives value for the instrument is informed at the time of delivery that there are insufficient funds to pay it. In making his argument appellant chooses to draw certain inferences which the trial court did not draw, and to disregard some

others which support the finding of fraud. ■ It is the duty of this court to assume in favor of the judgment "the existence of every fact which the trier of fact could have reasonably deduced from the evidence and then determine whether or not the guilt of the defendant is deducible therefrom." (*People* v. *Wallin,* 34 Cal.2d 777, 780 [215 P.2d 1].)

Undoubtedly the bank intended to give appellant immediate credit for checks deposited. The bank intended that appellant have immediate use of the money when he deposited a valid check drawn on another bank. But it is not a necessary inference, or even a reasonable one, that the bank intended to advance cash on a bad check, or one drawn as a part of a large-scale check-kiting scheme. (Cf. *People* v. *Martin,* 208 Cal.App.2d 867, 873 [25 Cal.Rptr. 610].) The fact that Mr. Hausman told appellant on the morning of December 12 that "the Klotzman checks had bounced" does not compel the inference that the bank intended to pay out money for bad checks when it received the Golden Bear Distributing Service checks later that day. In the first place, Mr. Hausman testified that he did not examine the checks which were being deposited when he authorized the December 12 withdrawal; in the second place, it is a reasonable inference that the bank knew much less than appellant did about Klotzman's activities. The deposit of the Golden Bear checks in appellant's account, accompanied by a request for an immediate withdrawal of cash, certainly can be construed as a representation by appellant that the checks were good. The bank could reasonably have believed appellant's representation that the checks on the Golden Bear account were good even though some other Klotzman checks had "bounced."

Appellant's argument that the evidence is insufficient to show that he knew the funds on deposit were insufficient, or that he intended to defraud the bank, is likewise based upon an interpretation of the evidence different from the trial court's interpretation. It is futile for appellant to cite such authorities as *People* v. *Griffith,* 120 Cal.App.2d 873 [262 P.2d 355], and *People* v. *Becker,* 137 Cal.App. 349 [30 P.2d 562], for the point that there is no intent to defraud if a drawer of a check has good reason to expect that a check will be paid when it reaches the drawee bank even though insufficient funds are on deposit when the check is delivered to the payee. The trial court drew the permissible inference that appellant had no reason to expect the last group of checks to be honored unless Klotzman could manage to cover them with the proceeds of another bad check. Nor did the Burke's ac-

count contain any balance which would protect the Citizens bank. A check-kiter's hope of keeping the game going for one more round is not the reasonable expectation which the law contemplates.

There is nothing to appellant's suggestion that his acquittal on the other counts establishes his good faith. Without going into the legal effect of an inconsistent judgment, it is sufficient to point out that there is no inconsistency here. The trial court merely gave appellant the benefit of the doubt as to all transactions before the last one.

Finally, appellant points out, correctly, that the $1,000 fine imposed by the court as a condition of probation is improper. The Attorney General agrees and suggests that the judgment be modified by reducing the fine to the legal limit of $500.

The judgment of the trial court was that appellant be punished by imprisonment in the county jail for the term of six months. Sentence was then suspended and appellant was placed on probation for a period of three years on the condition, among others, that he pay a fine of $1,000.

Penal Code, section 1203.1, provides in part: ''The court ... in the order granting probation and as condition thereof ... may fine the defendant in such sum not to exceed the maximum fine provided by law in such case.''

There is no provision in Penal Code, section 476a, for the imposition of a fine, but Penal Code, section 672, provides: ''Upon a conviction for any crime punishable by imprisonment in any jail or prison, in relation to which no fine is herein prescribed, the court may impose a fine on the offender not exceeding five hundred dollars ($500) in cases of misdemeanors or five thousand dollars ($5,000) in cases of felonies, in addition to the imprisonment prescribed.''

Since the court imposed a county jail sentence, the crime is deemed a misdemeanor for all purposes after judgment. (Pen. Code, § 17.) It follows that $500 is the maximum fine which could be imposed as a condition of probation in this case.

The judgment is modified by reducing the fine, imposed as a condition of probation, to $500. As so modified, the judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied July 15, 1964, and appellant's petition for a hearing by the Supreme Court was denied August 12, 1964.