[Crim. No. 10633. Second Dist., Div. Two. Apr. 24, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. MORRIS GENSER et al., Defendants and Appellants.

John J. Bradley and Burton Marks for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Jack E. Goertzen, Deputy Attorney General, Evelle J. Younger, District Attorney, and David Fuchs, Deputy District Attorney, for Plaintiff and Respondent.

ROTH, P. J.—We granted a rehearing in this case for the sole purpose of considering the effect of *Garrity* v. *New Jersey,* 385 U.S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616] and *Spevack* v. *Klein,* 385 U.S. 511 [17 L.Ed.2d 574, 87 S.Ct. 625] on our judgments sustaining the convictions of appellants.

Among the counts of which appellant Genser was convicted, were two charging perjury. Count XVII charged that on May 14, 1963, while testifying under oath before a deputy attorney general authorized to conduct an investigation into corruption and irregularities among DMV personnel, Genser falsely denied acquiring automobiles through manufacturers' representatives for persons other than himself. Count XX charged that on May 15, 1963, as part of the same investigation into DMV employee activities, Genser under oath falsely denied knowledge or participation in the dismissal of a misdemeanor criminal complaint against the Ed Shuey automobile agency.

It was stipulated at the trial that Genser, under oath, made the statements upon which the said two counts are based because it was probable that Genser knew he might lose his position if he refused to cooperate and answer questions.[1]

*Garrity* holds that incriminating statements made under circumstances such as those which are present here are within

---

[1] At a conference in chambers, with counsel present, the deputy district attorney stated: ''I am willing to stipulate . . . that if any person who was then employed by the Department of Motor Vehicles . . .

the scope of the privilege granted by the Fifth Amendment of the United States Constitution · and accordingly that such statements may not be used against an employee in a subsequent prosecution based upon criminal conduct admitted therein.

In *Garrity, supra,* the court says at pp. 565-566 [17 L.Ed. 2d] : "The choice given appellants was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda* v. *Arizona,* 384 U.S. 436, 464-465 [16 L.Ed.2d 694, 718, 86 S.Ct. 1602, 10 A.L.R.3d 974], is 'likely to exert such pressure upon the individual as to disable him from making a free and rational choice.' We think the confessions were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions."

■ Genser asserts that he could not, under the circumstances here detailed, have made false statements wilfully in the sense that word is used in our perjury statute. (Cf. *People* v. *Kuhn,* 216 Cal.App.2d 695, 697-699 [31 Cal.Rptr. 253].)

Conceding that under the *Garrity* rule Genser's decision to make the statements upon which the perjury counts are based, was not a voluntary one, the specific question presented to this court is whether one compelled to make sworn statements under compulsion such as illustrated by the facts at bench, has a license to make untruthful statements. We think not.

*Garrity's* specific holding is that incriminating statements made under such circumstances may not be received in evidence in a subsequent prosecution based upon a crime revealed therein. However, even if *Garrity* had gone further and extended a complete "implied immunity" from prosecution for the crime revealed, the result would not be different.

In *Glickstein* v. *United States* (1911) 222 U.S. 139 [56 L.Ed. 128, 32 S.Ct. 71], a bankrupt as required under the bankruptcy statute did make statements under oath at a first meeting of his creditors which were false. Immunity from prosecution was afforded to bankrupts under subsection 9 of the Bankruptcy Act in effect at that time.

refused to go to the District Attorney's Office or refused to answer questions, that he would be fired. . . . I will stipulate that that fact probably came to their attention, . . . they had a choice of either not going at all and being fired or going and trying to handle the situation as best

Glickstein, having been convicted in the trial court of having committed perjury in the making of such statements, appealed to the Fifth Circuit and that court certified to the Supreme Court the following question:

" 'Is subsec. 9 and the immunity afforded by it applicable to a prosecution for perjury committed by the bankrupt when examined under it?'" (*Glickstein* v. *United States, supra,* 222 U.S. 139, 140 [56 L.Ed. 128, 129].)

The United States Supreme Court analyzes the privilege granted under the Fifth Amendment and the power of the Government to compel testimony despite the constitutional privilege when immunity is given. It says at pp. 141-143 [56 L.Ed. at pp. 129-131]: ". . . an authority which can only extend to the licensing of perjury is not a power to compel the giving of testimony."

The court then cites certain federal statutes which provide specifically that immunity given under the Fifth Amendment shall not extend to " '. . . exempt any party . . . from prosecution for perjury. . . .' "

No similar California statutes have been called to our attention. Assuming there are none, *Glickstein, supra,* anticipates such an omission. The court says at pp. 141-143 [56 L.Ed. at pp. 129-131]:

"In other words, the sole question is, Does the statute, in compelling the giving of testimony, confer an immunity wider than that guaranteed by the Constitution? The argument to maintain that it does is that, as the statute provides for immunity, and does not contain the reservation found in either § 860, Rev. Stat., or that embodied in the act of 1893, therefore, under the rule that the inclusion of one is the exclusion of the other, such reservation cannot be implied. Or, to state the proposition in another form, it is that as the statute in the immunity clause says, 'But no testimony given by him (the witness who is compelled to be examined) shall be offered in evidence against him in any criminal proceeding,' and as these words are unambiguous, there is no room for limiting the language so as to cause the immunity provision not to prohibit the offer of the testimony in a criminal prosecution for perjury. But the contention assumes the question for decision, since it excludes the possibility of construction when, on the face of the statute, the meaning attributed to the immunity clause cannot be given to it without destroying the words of the statute and frustrating its obvious object

and intent. This may not be denied, since the statute expressly commands the giving of testimony, and its manifest purpose is to secure truthful testimony, while the limited and exclusive meaning which the contention attributes to the immunity clause would cause the section to be a mere license to commit perjury, and hence not to command the giving of testimony in the true sense of the word.

"The argument that because the section does not contain an expression of the reservation of a right to prosecute for perjury in harmony with the reservations in Rev. Stat., § 860, and the act of 1893, therefore it is to be presumed that it was intended that no such right should exist, we think, simply begs the question for decision, since it is impossible in reason to conceive that Congress commanded the giving of testimony, and at the same time intended that false testimony might be given with impunity, in the absence of the most express and specific command to that effect.

"Bearing in mind the subject dealt with, we think the reservation of the right to prosecute for perjury, made in the statutes to which we have referred, was but the manifestation of abundant caution; and hence, the absence of such reservation in the statute under consideration may not be taken as indicative of an intention on the part of Congress that perjury might be committed at pleasure.

"Some of the considerations which we have pointed out were accurately expounded in *Edelstein* v. *United States*, 149 F. 636 [79 C.C.A. 328, 9 L.R.A. N.S. 236], by the circuit court of appeals for the eighth circuit, and in *Wechsler* v. *United States* 158 F. 579 [86 C.C.A. 37], by the circuit court of appeals for the second circuit. And this leads us to observe that the necessary result of the conclusion now reached is to disapprove the opinions in *Re Marks*, 102 F. 676, and *Re Logan*, 102 F. 876.

"It follows that the question propounded must receive a negative answer, and our order will be, question certified answered 'No.' ''

The few cases cited to us indicate the same conclusions. (*Commonwealth* v. *Knight* (1815) 12 Mass. 274 [7 Am.Dec. 72]; *Bain* v. *State* (1890) 67 Miss. 557 [7 So. 408]; *Hardin* v. *State* (1919) 85 Tex.Crim.Rep. 220 [211 S.W. 233, 240, 4 A.L.R. 1308].)

It follows that the reliance of appellants upon *Garrity* and *Spevack* is misplaced.

In all other respects we reiterate what we have said in our former opinion. *People* v. *Genser* (Cal.App.) · [56 Cal.Rptr. 380].

The judgments of conviction are affirmed.

Herndon, J., and Fleming, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied June 21, 1967. Mosk, J., did not participate therein.

The prior opinion, reiterated by the court, reads as follows:

ROTH, P. J.—On August 21, 1963, defendants Genser, Koffman and Edling were indicted for multiple violations of the Penal Code arising out of their activities in connection with operations of the Department of Motor Vehicles, (DMV).

All three defendants were charged with conspiracy, 44 overt acts being alleged, in violation of section 182, subdivisions 1 and 5 of the Penal Code in that they conspired to commit violations of sections 68 (bribery), 70 (acceptance of gratuities), 118 (perjury), 484 (theft), 487, subdivision 1 (grand theft), 518 (extortion), 653f (solicitation to certain crimes), and "to commit acts injurious to public morals and to pervert and obstruct justice and the due administration of the laws."

After dismissal of some of the charges, Genser was charged with 10 counts of bribery, three counts of perjury, one count of solicitation to bribery, one count of grand theft. Koffman was charged with four counts of bribery, three counts of solicitation to bribery, two counts of perjury, one count of extortion, one count of grand theft. Edling was charged with bribery, grand theft and perjury.

The trial was to a jury and consumed two and one-half months. Numerous witnesses called by the prosecution, testified to the offenses upon which the defendants were finally tried. The defendants called many witnesses and each took the stand in his own behalf. Approximately 185 exhibits were put into evidence. The jury found Genser guilty of conspiracy, nine counts of bribery, two counts of perjury and one count of grand theft; he was found not guilty on one count each of bribery, solicitation to bribery, and extortion. Koffman was convicted of conspiracy, three counts of bribery, solicitation to bribery, and grand theft; he was found not guilty on one

count of bribery, two counts each of solicitation to bribery, extortion, and perjury. Edling was convicted of grand theft and bribery and acquitted on the perjury charges.

All defendants moved for a new trial. The motions were denied. Genser and Koffman were sentenced to state prison and have appealed from the judgments. Edling received probation. His appeal was dismissed (rule 17(a)).[1]

Between 1958 and 1963, Genser was the supervising investigator for DMV, Region 2, which includes all of California south of the Tehachapis. He and his staff were responsible for investigation of, and were required to make reports on, dealer license applications, Report of Sale books, and dealer records required by DMV. Included in the reports was a recommendation to the head office in Sacramento as to assessment of penalties and/or license suspensions in case of violations.

Edling was an investigator for DMV assigned to the Whittier office within Region 2. During the period in question, he worked directly under Genser from the DMV office in Los Angeles.

Koffman, a personal friend of Genser, conducted a service business under the name California Automobile Dealers Service Bureau. Koffman's service consisted of transmitting fees and documents from automobile dealerships to DMV and advising dealership personnel on correct procedures for complying with DMV regulations. He was retained by approximately 80 such clients on a regular basis, at fees ranging from about $25 to $65 per month. He visited their offices weekly, sometimes less often.

The unlawful conduct charged divides into four categories:

1) Expediting of automobile dealership license applications. To open a dealership for the sale of automobiles, it is necessary to obtain a license (Veh. Code, § 11700). The aspiring dealer fills out an application at a DMV office. After a phone check with Sacramento, a temporary permit (license) is issued allowing sale of cars. It is then processed by the office of the supervising investigator. It normally took about four to six weeks to process a license application in the Los Angeles area in 1959.

Two of the bribery counts against Genser resulted from his acceptance of two several $200 "fees" to speed up processing of Dick Steele Rambler's application (temporary license

---

[1]The word "defendants" used hereafter throughout this opinion refers to Genser and Koffman only.

granted same day as application filed), and Anaheim Dodge (permit issued one day after application assigned for investigation).

2) DMV Audits. DMV supplies dealers with Report of Sale books containing documents to be used, including parts to be filed with DMV, on sale of a car. When a dealer is audited, his books are examined to determine violations of DMV procedures in respect of fees or the amounts thereof owing DMV, and whether penalties should be assessed. The ultimate sanctions against a dealer is license suspension or revocation.

Reports would be prepared by Genser's office with recommendations as to sanctions against the particular dealer, and forwarded to Sacramento. In addition to conspiracy charges in respect of fixing these reports, there were five counts of bribery against Genser, three against Koffman, two against Edling, and alternative charges of extortion and grand theft. A pattern of operation with slight variations emerges from the evidence which was present in each:

A dealer would find himself in trouble with DMV. Koffman, by virtue of his regular contact with dealerships, would offer either to "investigate" the difficulties or to "see what he could do" about the violations and the sanctions incident thereto.

Koffman, or one Oliver (an employee of a management group with financial interest in several dealerships), would request money for "expenses" in connection with their undertaking "to investigate" or to pay off "those who had to be taken care of" in order to eliminate or reduce penalties. The money for "investigation" payments was paid by check drawn at Koffman's request to "M. Benson Co.," a nonexistent firm. Koffman cashed the check and gave the money to Genser, who it was charged and proved, then recommended against severe sanctions.

3) Referral Selling Plan. In early 1962, upon special request of DMV, the District Attorney of Los Angeles County began an investigation of a so-called referral selling plan, a fraudulent scheme whereby those outsiders (potential buyers) by enlisting in the plan, were tricked into signing a document which turned out to be a contract for the purchase of an automobile.

Operators of the referral selling plan did business under the name of "M & M Advertising Company," and worked with a number of dealerships in the Los Angeles area. A prospective "buyer" would be told he had been selected to

participate in an advertising campaign and the reward for his cooperation would be a new car of his choice. He would then sign what was presented as an employment contract with the advertising agency, hand over the pink slip to his car or a cash deposit as a sign of good faith, and be given a new car to drive around and show his friends. For each sale resulting from showing the new car, the "buyer" would receive a credit. After 12 credits, the new car was to be his.

When it later developed that the "buyer'" sold no cars, and he was unable or unwilling to pay for the new car he was driving, the dealer would repossess the new car, turn back the odometer and resell the car as new.

More than 20 persons were indicted for conspiracy and grand theft based upon this selling plan. DMV audited the dealers involved in the plan. Both Genser and Koffman were charged with bribery in having accepted and solicited money to influence their official actions as it related to particular dealer audits, to wit: to find fewer violations and recommend less stringent sanctions against offending dealers.

4) Perjury. In the course of investigations by DMV and by the Attorney General and the Los Angeles district attorney, Genser, under oath, stated that he did not use his office to obtain at a reduced price for various third persons, (in some instances at a profit to himself) Oldsmobiles and Thunderbirds. He also denied under oath that he had anything to do with trying to get a misdemeanor criminal complaint against the Ed Shuey Agency (a client of Koffman at the time) dropped. Evidence was introduced at trial which showed that Genser in fact did these things. He was convicted on two counts of perjury.

Genser contends that: The trial judge erroneously denied a timely motion to disqualify himself under section 170.6 of the Code of Civil Procedure; the conspiracy charged denied him a fair trial; the evidence on certain counts was legally insufficient to sustain conviction; in several instances, there was a lack of corroboration of testimony of accomplices, and refusal by the court to give certain instructions re accomplices.

Koffman contends that: The conspiracy charged denied him a fair trial; that the evidence on all of the counts on which he was convicted was insufficient, and that the sentences imposed were improper.

On June 15, 1964, the instant case was transferred by the criminal master calendar department of the superior court to department 49 for trial. The trial judge and all counsel had a

conference in chambers. The deputy district attorney estimated the trial would take two and one-half months and the judge informed counsel that military reserve duty (two weeks) and a speaking engagement (one day) might require him to postpone the trial for these periods. He indicated he would try to make the two-week postponement unnecessary. No objection was made by any counsel.

Thereafter, several motions concerning exhibits and witnesses were argued to and decided by the same trial judge and selection of the jury was commenced. Numerous prospective jurors were excused on June 15 and on June 16. The process of jury selection continued with the summoning of several supplementary jury panels. Trial was adjourned until June 18.

On June 18, Genser requested a conference in chambers. Genser suggested he desired to move for disqualification of the trial judge under section 170.6 of the Code of Civil Procedure. Genser asserted that the delay which would be necessitated by the judge's prior commitments mentioned above, would prejudice him because of adverse newspaper coverage during the period of delay. His attorney said: ". . . [M]y client's position is that . . . because of the fact that this case was accepted by you under these circumstances that you do not have his best interests in mind. I don't agree with this, but this is his opinion."

The trial judge indicated that he would transfer the case back to the master calendar for reassignment if all counsel agreed. Counsel for Koffman did not agree; he wished to proceed to trial without further delay; counsel for Edling also desired to proceed. The court denied as untimely a motion then made by Genser to permit him to file an affidavit under 170.6. Genser thereupon filed a motion for disqualification under section 170, subdivision 5 of the Code of Civil Procedure alleging prejudice. It was heard by another judge and denied. The case proceeded to trial.

 Genser contends that his motion under section 170.6 was timely and should have been granted.

Section 170.6 (peremptory challenge) provides for the filing of an affidavit of prejudice against a judge and for the automatic retransfer where a master calendar is used, without proof of the allegations of prejudice. The section states in part: "If directed to the trial of a cause where there is a master calendar, the motion shall be made to the judge supervising the master calendar not later than the time the cause is

assigned for trial. In no event shall any judge entertain such motion if it be made after the drawing of the name of the first juror, . . . or after trial of the cause has otherwise commenced.''

█ It is clear that if Genser's motion under 170.6 were timely, the court would have been without jurisidiction to try the case. (*Lewis* v. *Linn,* 209 Cal.App.2d 394, 399 [26 Cal. Rptr. 6].) The judge against whom the affidavit is filed may determine whether it is timely. (*Andrews* v. *Joint Clerks Port Labor Relations Committee,* 239 Cal.App.2d 285, 294 [48 Cal.Rptr. 646].) █ Section 170.6, while extending at privilege, makes exercise of the privilege subject to certain conditions designed to minimize abuses. (*McClenny* v. *Superior Court,* 60 Cal.2d 677, 685-686 [36 Cal.Rptr. 459, 388 P.2d 691]; *Pappa* v. *Superior Court,* 54 Cal.2d 350, 354 [5 Cal.Rptr. 703, 353 P.2d 311].) Genser did not meet these conditions.

█ At bench no affidavit was filed at the time of assignment in the master calendar department and in spite of a conference after assignment, between all counsel and the judge, at which conference the ''grounds'' later asserted as indicative of prejudice were made clear, no motion for disqualification was made until after part of two days was spent in hearing motions and selecting a jury. There is nothing in the statute which allows for examination of the judge by counsel prior to moving to disqualify him, nor for the anticipatory correction of errors which might later form the basis of appeal. (Cf. *Calhoun* v. *Superior Court,* 51 Cal.2d 257, 260 [331 P.2d 648].) Under these circumstances, the court properly held the motion under section 170.6 untimely.

█ Both defendants contend that the extensive conspiracy charges in respect of specific crimes, together with the general charge of conspiracy to commit acts injurious to public morals and to pervert and obstruct the due administration of justice, prejudiced them before the jury. They say that, considering the volume of hearsay evidence admitted conditionally on the conspiracy charges, ''it is impossible to conclude that the jury did not consider such hearsay to find that a conspiracy existed despite the court's instruction that they must rely on independent evidence.''

█ The jury received complete and proper instructions on the conditional receipt of hearsay evidence. It must be assumed that the jury understood and followed the court's

instructions. (*People* ex rel. *Department of Public Works* v. *Lillard,* 219 Cal.App.2d 368, 376 [33 Cal.Rptr. 189].)

Neither of the defendants points out the slightest inadequacy in a voluminous record which indicates that there was not sufficient *competent* evidence on which the jury could find an agreement both to engage in the unlawful acts and to prevent discovery thereof by law enforcement officials.

██ The charge of conspiracy to commit acts injurious to public morals and administration of justice was not made as an attempt to unnecessarily malign defendants. The charge that it may have had an adverse effect on defendants is supported by nothing in the record to which our attention is called and by no argument other than the stated claim to that effect. The course of conduct charged and proved indicates to the contrary that the charge aptly fits the conduct for which defendants were indicted. ██ In *Lorenson* v. *Superior Court,* 35 Cal.2d 49, at page 59 [216 P.2d 859], the court says: ''Generally speaking, conduct which constitutes an offense against public justice, or the administration of law includes both malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations.''

██ Defendants do not serously challenge the rules of evidence as they relate to the proof of the existence of conspiracy. The challenge made is to the inferences and deductions drawn by the jury from a plethora of evidence of wrongdoing by defendants charged with the substantive offenses of bribery, grand theft, and perjury. ██ It is clear that ''cover-up'' activities in respect of committed crimes can be part of a conspiracy to commit those crimes. (*People* v. *Buono,* 191 Cal.App.2d 203, 234 [12 Cal.Rptr. 604]; *People* v. *Wells,* 187 Cal.App.2d 324, 330 [9 Cal.Rptr. 384].) ██ The volume of evidence complained of relating to conspiracy in inferences and deductions made therefrom, was an inevitable by-product of the charges against defendants.

It should be remembered, as was retiterated in *Lorenson, supra,* at page 57, that '' '[I] was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be and from the secrecy of the crime

usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole. (*People* v. *Jones,* 136 Cal.App. 722 [29 P.2d 902]; *People* v. *Benenato,* 77 Cal.App.2d 350 [175 P.2d 296].)' (*People* v. *Burton,* 91 Cal.App.2d 695, 708 [205 P.2d 1065].)'' (See also *People* v. *Neighbors,* 218 Cal.App.2d 593, 598 [32 Cal.Rptr. 473]; *Anderson* v. *Superior Court,* 78 Cal.App.2d 22, 24 [177 P.2d 315].)

A review of the record in this case reveals that both defendants' contentions as to insufficiency of the evidence and lack of corroboration on certain counts are without merit. It would serve no purpose to set forth the facts in detail to buttress these conclusions. (See *Marson* v. *Rand,* 107 Cal.App.2d 466, 468 [237 P.2d 18].)

▋ Genser asserts error because the court refused to instruct the jury that the managers of the automobile agencies who, after having been solicited for a bribe by Oliver, went to their employers and asked for bribery money, were accomplices as a matter of law. The court did instruct the jury that Oliver was an accomplice as a matter of law and that his testimony required corroboration.

The court's refusal to instruct that the solicited managers were accomplices because they transmitted the message to their respective employers, was proper. The solicitation was made of the managers; that they had to go further to obtain the money from the owners of the dealerships does not change their relationship to the solicitor, Oliver. ▋ ''It has been established that where a bribe is solicited the victim is not an offender and cannot be considered an accomplice of the person seeking the bribe. (*People* v. *Ruef,* 14 Cal.App. 576 [114 P. 48, 54]; *People* v. *Powell,* 50 Cal.App. 436 [195 P. 456]; *People* v. *Brigham,* 72 Cal.App.2d 1 [163 P.2d 891]; 9 Cal. Jur.2d 76, § 23.)'' (*People* v. *Lyon,* 135 Cal.App.2d 558, 576 [288 P.2d 57].) ▋ The question of actual complicity of any of the managers was properly left to the jury. The jury was told what an accomplice was. An instruction that the managers were accomplices as a matter of law ''could be given only if undisputed evidence established the complicity.'' (*People* v. *Davis,* 43 Cal.2d 661, 672 [276 P.2d 801].)

▋ Koffman contends that the sentences imposed were improper. He was convicted on the conspiracy count and on five substantive counts. The court sentenced him to state prison for the term prescribed by law, all sentences to run

concurrently. The court stayed execution on all sentences except for conspiracy pending appeal, and provided that during the term of, and at completion of service of any sentence on the conspiracy count, the stays on the other counts were to become permanent.

Koffman contends that since there was only one conspiracy and all the substantive crimes were connected together in their commission, only one sentence, on the conspiracy charge, should have been imposed. (See *People* v. *Keller*, 212 Cal.App. 2d 210, 220 [27 Cal.Rptr. 805].)

The prohibition, as double punishment, against imposing multiple sentence albeit to run concurrently (expressed in *Neal* v. *State of California*, 55 Cal..2d 11, 18 [9 Cal.Rptr. 607, 357 P.2d 839], and followed in *Keller, supra*) is directed against multiple punishment for different crimes that flow from the *same unlawful act*. Separate sentences on conspiracy and on the separate substantive offenses committed as a part of the conspiracy, do not constitute double punishment. (*People* v. *Scott*, 224 Cal.App.2d 146, 152 [36 Cal.Rptr. 402] ; *People* v. *Martin*, 208 Cal.App.2d 867, 876-878 [25 Cal.Rptr. 610] ; *People* v. *Diaz*, 206 Cal.App.2d 651, 672-674 [24 Cal.Rptr. 367].) Koffman has no proper complaint of the sentence. (See *People* v. *Niles*, 227 Cal.App.2d 749, 754-756 [39 Cal.Rptr. 11].)

The judgment as to each defendant is affirmed.

Herndon, J., and Fleming, J., concurred.