STATE OF NEW JERSEY. PLAINTIFF-APPELLANT, v. NICHOLAS FALCO, DEFENDANT-RESPONDENT.

Argued March 6, 1972—Decided June 19, 1972.

*Mr. Michael H. Stieber,* Assistant Prosecutor, argued the cause for appellant (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Robert R. Blasi* argued the cause for respondent (*Mr. Elmer J. Herrmann, Jr.,* on the brief; *Messrs. Herrmann and Blasi,* attorneys).

The opinion of the Court was delivered by

WEINTRAUB, C. J. Defendant Falco, a detective of the City of Newark, was convicted on two charges of misconduct in office (*N. J. S. A.* 2A:85–1 and 2A:135–1). The Appellate Division reversed, 114 *N. J. Super.* 53 (1971), and we granted the State's petition for certification, 58 *N. J.* 603 (1971).

The charges stemmed from a serious brawl in a licensed tavern. The State contended defendant was present. A waitress was injured in the melée. She was taken to a hospital where, the State claimed, two other officers persuaded her to eliminate a reference to a beating in the medical his-

tory and to say she was injured in a fall. Those other officers were also indicted. We are here concerned only with the conviction of the defendant Falco.

As we have said, defendant was convicted on two counts. One alleged the failure to report "the actions of certain persons unknown to the Grand Jurors aforesaid who participated in a fight" at the specified tavern. Defendant did not dispute that it was his official duty to report such an event in licensed premises if he was present. Rather defendant denied he was there. Although the State's proof implicated defendant as a participant, such misbehavior was no part of the charge. The charge was that he did not report the illegal actions of others, and the case went to the jury on that basis.

The second charge of official misconduct upon which defendant was convicted was that he later filed a false report about the affair. The facts, briefly, are these. Having learned in some way of the event mentioned above, a superior officer called upon defendant to file a report with respect to the brawl. Again defendant conceded it was his official duty to comply with that demand. After consulting with counsel, defendant filed the report. In that report defendant said he was in and out of the tavern several times during the night; that no fight occurred in his presence; that when he entered on one occasion, other police officers were present; that he inquired of a patron as to why the officers were there and was told a woman "had slipped and fallen down"; and that "it appeared to me that the above officers had the situation under control and did not need any assistance from me." The State contended, and the jury found, the report was false in the statement that defendant was not present during the fracas.

The Appellate Division held that if defendant filed the written report just mentioned because he feared he would lose his job if he refused to do so, then the report was not admissible in evidence, and this because of *Garrity v. New*

*Jersey,* 385 *U. S.* 493, 87 S. Ct. 616, 17 *L. Ed.* 2d 562 (1967). On this basis, the convictions on both counts were reversed.

## I

 Defendant does not spell out how the admission into evidence of the written report affected the conviction on the first count. The nonfeasance charged in that count consisted of the willful neglect of the duty to report the fight at the tavern. The proof of the State's case on that charge did not rest on the written report. On the contrary in the written report defendant flatly denied he was present at the time of the fight. So far as the first charge is concerned, the written report was exculpatory, and in fact accorded with defendant's testimony at the trial. The written report did place defendant at the scene after the event, but the State's case was not advanced by that concession. Rather the written report was placed in evidence because it was itself the criminal event involved in the second charge. For the reasons given in Part II of this opinion, we believe the written report falls outside of *Garrity,* but if it be assumed the admission of the written report was erroneous as to the first charge, the error was harmless beyond a reasonable doubt. *State v. Macon,* 57 *N. J.* 325, 340–341 (1971); *People v. Hooper,* 250 *Cal. App.* 2d 118, 58 *Cal. Rptr.* 100, 101 (Ct. App. 1967).

## II

The *Garrity* case was before us under the name of *State v. Naglee,* 44 *N. J.* 209 (1965). Three defendants were convicted of conspiracy to obstruct the due administration of the motor vehicle traffic laws. Naglee was the clerk of the municipal court and Garrity was the chief of police. The indictment charged defendants conspired to dispose of eight drunken driving cases by altering to a lesser charge the tickets issued by another officer, the third defendant;

that entries were made in the municipal court dockets show-
ing the traffic offenders appeared in open court and were
fined by the magistrate when in fact no hearings were held;
that Garrity required some offenders to post bail and then
arbitrarily fixed the fines; and that in some instances Gar-
rity diverted the difference between the bail and the fine
to unauthorized uses. In the investigation conducted by a
deputy attorney general, Garrity was advised that if he de-
clined to answer questions, he might be removed from office.
A statute, *N. J. S. A.* 2A:81–17.1, would have led to that
result. Garrity gave an incriminating statement which was
introduced at the criminal trial. We found as a fact that
his statement was not involuntary. We held further that the
warning given by the deputy attorney general "was a type of
compulsion which may be legitimately used," 44 *N. J.* at
222, and hence there could be no claim that Garrity's Fifth
Amendment privilege was infringed. Our judgment was
reversed in *Garrity* by a vote of 5 to 4.

In deciding *Naglee,* we saw nothing improper or unrea-
sonable in the exercise of a public employer's right to in-
quire into the employee's fidelity. We of course recognized
that Garrity would have preferred to say nothing and was
led to talk by his desire to retain an office he might other-
wise be unable to keep. And we appreciated, too, that every
confession may be said to be involuntary if it was not vol-
unteered, in the sense that whenever a person who intended
not to confess was led to change his mind, his will to be
silent was overturned. But we did not understand the Fifth
Amendment to mean that a person is entitled to be insulated
from any and every circumstance that might lead him to
choose to speak.

Rather we assumed that a suspect ·may not insist that
legitimate interests of government be denied merely because
he will face a dilemma if they are not. In *State v. Garvin,*
44 *N. J.* 268 (1965), we had dealt with a conspicuous ex-
ample of such a dilemma — the trial of an indictment. The
pressure upon the defendant to testify is usually more com-

pelling than the threat of the loss of employment, for the individual's freedom may be at stake and indeed his job too as a consequence of a conviction, and of course a defendant does not have the option of a public employee to avoid the inquiry by walking away. In rejecting Garvin's claim that he was coerced into taking the stand in his own defense, we accepted the premise that "The criminal trial itself is inherently coercive" but nonethless found no violation of the Fifth Amendment, adding that "We assume no one would seriously suggest that because of such compulsion the Fifth Amendment bars cross-examination of a defendant or the use against him of anything he says on direct." 44 *N. J.* at 278.

In *Garvin* the coercion supposedly inhered in the State's assertion of its legitimate interest to try an indictment. In *Garrity* the coercion supposedly stemmed from the assertion of the government's legitimate interest to assure integrity in public office by disciplining an officer who was faithless to the obligations of his office. Upon the premise that the Fifth Amendment was not intended to secure a miscreant in public office, we held that the choice was Garrity's to answer or to quit. We did not think it immoral or indecent to put an officer to that decision. Perhaps to put it another way, the pressure upon the officer to speak resulted proximately from his desire to hold on to an office which belongs to the public, rather than from the public employer's exercise of its undoubted right to protect itself from a criminal misuse of its offices.

An intermediate position was conceivable in the Garrity situation — that the officer's confession be used to oust him from office but not in the prosecution of his crime in office. But a "use restriction" would mean that the criminal prosecution would be encumbered by a claim that the State's case was "tainted" by the use of the officer's statements or leads they furnished. In practical effect a "use restriction" could result in "transactional immunity." We did not think the Fifth Amendment intended that government choose to suf-

fer infidelity in office or to forego a prosecution for crime. We thought the Fifth Amendment left the option to the officer to talk or to quit.

As we read the majority opinion in *Garrity*, it did not dispute the State's obvious interest in the integrity of performance in public office. Rather it simply gave no weight to that interest. This is evident from footnote 3 of the plurality opinion in *Spevack v. Klein*, 385 *U. S.* 511, 87 S. Ct. 625, 17 *L. Ed.* 2d 574 (1967), a case decided with *Garrity* and holding that a lawyer may not be disbarred for refusing on Fifth Amedment grounds to produce relevant records in a disciplinary inquiry. In that footnote, *Spevack* said of *Garrity*:

> "Whether a policeman, who invokes the privilege when his conduct as a police officer is questioned in disciplinary proceedings, may be discharged for refusing to testify is a question we did not reach."

Thus in deciding whether Garrity was protected by the Fifth Amendment from the pressure he felt, the majority did not weigh the legitimacy of the State's interest. To the majority the issue seems to have been simply this: did the State do something which led, or could have led, Garrity to abandon the silence he preferred. In the words of *Garrity*, "The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." 385 *U. S.* at 497, 87 S. Ct. at 618, 17 *L. Ed.* 2d at 565.

If we are correct in our view of *Garrity* that it rests upon the premise that *any* pressure generated by a proper pursuit of a governmental interest offends the Fifth Amendment privilege, it must be doubted that a majority of the Supreme Court of the United States continue to subscribe to that thesis.

In *Gardner v. Broderick*, 392 *U. S.* 273, 88 S. Ct. 1913, 20 *L. Ed.* 2d 1082 (1968), and *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation*, 392 *U. S.* 280, 88 S. Ct. 1917, 20 *L. Ed.* 2d 1089 (1968), it was held

that a public employee could not be discharged because he refused to waive his Fifth Amendment privilege, but the Court answered the question reserved in footnote 3 of *Spevack* and said he could be discharged for refusing to account to his public employer.[1] This led Mr. Justice Harlan, with the concurrence of Mr. Justice Stewart, to say with respect to *Garrity* and *Spevack* (392 *U. S.* at 285, 88 S. Ct. at 1920, 20 *L. Ed.* 2d at 1088):

> * * * I can find no solidly acceptable course for me to take in these cases other than to concur in the judgments rendered by the Court. I do so with a good deal less reluctance than would otherwise have been the case because, despite the distinctions which are sought to be drawn between these two cases, on the one hand, and Spevack and Garrity, on the other, I find in these opinions a procedural formula whereby, for example, public officials may now be discharged and lawyers disciplined for refusing to divulge to appropriate authority information pertinent to the faithful performance of their offices. I add only that this is a welcome breakthrough in what Spevack and Garrity might otherwise have been thought to portend.

We think *Gardner* and *Uniformed Sanitation Men* departed appreciably from the philosophical bent of *Garrity* and *Spevack* in saying that the reluctant officer may be discharged. Conceptually, the thesis of *Garrity* should have abhorred the infliction of any such "penalty" for asserting the supposed constitutional privilege to be silent.

The remaining question under *Garrity* is whether an officeholder who does answer may be fired because of misbehavior he thereby confesses. *In re Addonizio, 53 N. J.* 107, 135 n. 3 (1968). It would be absurd to say that he may not, since then it would serve no useful purpose to exercise the public right acknowledged in *Gardner* and *Uniformed Sanitation Men* to call upon a public officer to account. To date

---

[1]After remand, the employees who refused to answer were discharged, and the discharge was upheld. *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation*, 426 *F.* 2d 619 (2 Cir. 1970), *cert.* denied, 405 *U. S.* ——, 92 S. Ct. 2055, 32 *L. Ed.* 2d 349 (May 30, 1972).

*Garrity* has not been read to prevent the discharge of the officeholder on the basis of his confession. See *Jones v. Civil Service Comm.*, 489 *P.* 2d 320 (Colo. Sup. Ct. 1971); *Kammerer v. Board of Fire and Police Com'rs*, 44 *Ill.* 2d 500, 256 *N. E.* 2d 12 (Sup. Ct. 1970). And yet to say that the "coerced" statement may thus be the basis for a "forfeiture" of public office is to question the very core of *Garrity*.

Cases since *Garrity* surely reveal that a weighing process is involved when the pursuit of a governmental interest puts an individual to a choice between silence and possible incrimination. *California v. Byers*, 402 *U. S.* 424, 91 S. Ct. 1535, 29 *L. Ed.* 2d 9 (1971), involved a "hit-and-run" statute requiring a motorist to stop at the scene of an accident and to identify himself. The California Supreme Court sustained the statute but held the Fifth Amendment required that neither the disclosure nor its fruits be used in any prosecution. But a majority of the United States Supreme Court disagreed with that view of the Amendment and held there need be no restriction upon the use of the disclosure.

The plurality opinion in *Byers,* written by the Chief Justice, started with the proposition that the issue "must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other." 402 *U. S.* at 427, 91 S. Ct. at 1537, 29 *L. Ed.* 2d at 17. Upon that balance, the plurality opinion found no inroad upon the Fifth Amendment. It noted in passing that "There is no constitutional right to refuse to file an income tax return or to flee the scene of an accident in order to avoid the possibility of legal involvement." 402 *U. S.* at 434, 91 S. Ct. at 1541, 29 *L. Ed.* 2d at 21. Mr. Justice Harlan provided the decisive vote, also upon a weighing of the governmental interest and the impact upon the privilege. In rejecting a "use restriction" as a solvent, he stressed it would unduly hamper law enforcement since it would involve the question of taint and perhaps lead in practical effect to a total immunity from prosecution.

We mentioned earlier the trial of an indictment, as a helpful analogue, pointing out that such a trial is far more coercive than an inquiry into the right to continue in employment with government. Here again the holdings of the United States Supreme Court do not square with *Garrity's* view that the Fifth Amendment protects the individual from the dilemma of choosing whether to speak. The Supreme Court has never held that the testimony a defendant gives in his own defense is involuntary within the meaning of the Fifth Amendment. The use against a defendant of his prior testimony has been barred in some limited situations, but not on the ground that his testimony was coerced in violation of the Fifth Amendment.

Thus in *Simmons v. United States,* 390 *U. S.* 377, 88 S. Ct. 967, 19 *L. Ed.* 2d 1247 (1968), in which the majority held that the prosecution could not use testimony defendant had given on a motion to suppress evidence he claimed was illegally seized, the sole basis was that defendant should not be required to choose between constitutional rights and therefore he should be permitted to pursue his Fourth Amendment right without yielding his Fifth Amendment privilege. And in *Harrison v. United States,* 392 *U. S.* 219, 88 S. Ct. 2008, 20 *L. Ed.* 2d 1047 (1968), where a conviction was reversed because of the improper admission of three confessions, the majority barred the use at the retrial of defendant's prior testimony on the thesis that such testimony was induced by the illegal confessions and hence was the "fruit" of that "poisonous tree." The majority expressly noted that (392 *U. S.* at 222, 88 S. Ct. at 2010, 20 *L. Ed.* 2d at 1051) :

In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

We add, for whatever it may contribute to the immediate discussion, that a confession inadmissible under *Miranda* may be used on cross-examination of a defendant to challenge his credibility. *Harris v. New York*, 401 *U. S.* 222, 91 S. Ct. 643, 28 *L. Ed.* 2d 1 (1971).

In upholding a notice-of-alibi rule in *Williams v. Florida*, 399 *U. S.* 78, 90 S. Ct. 1893, 26 *L. Ed.* 2d 446 (1970), the majority said (399 *U. S.* at 83–84, 90 S. Ct. at 1897, 26 *L. Ed.* 2d at 451):

> The defendant in a criminal trial is frequently forced to testify himself and to call other witnesses in an effort to reduce the risk of conviction. When he presents his witnesses, he must reveal their identity and submit them to cross-examination which in itself may prove incriminating or which may furnish the State with leads to incriminating rebuttal evidence. That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination. The pressures generated by the State's evidence may be severe but they do not vitiate the defendant's choice to present an alibi defense and witnesses to prove it, even though the attempted defense ends in catastrophe for the defendant. However "testimonial" or "incriminating" the alibi defense proves to be, it cannot be considered "compelled" within the meaning of the Fifth and Fourteenth Amendments.

In *McGautha v. California*, 402 *U. S.* 183, 91 S. Ct. 1454, 28 *L. Ed.* 2d 711 (1971), one issue was the constitutionality of a unitary as opposed to a bifurcated trial in a capital case. The proposition was pressed that a defendant who wanted to testify as to punishment might expose himself on the issue of guilt. Again the majority of the Supreme Court rejected the claim that all compulsion to choose whether to testify is barred by the Fifth Amendment. The majority said (402 *U. S.* at 213, 91 S. Ct. at 1470, 28 *L. Ed.* 2d at 729):

> The criminal process, like the rest of the legal system, is replete with situations requiring "the making of difficult judgments" as to which course to follow. *McMann v. Richardson*, 397 U. S. [759] at 769, 90 S. Ct. [1441], at 1448, 25 L. Ed. 2d [763] at 772. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that

token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved. Analysis of this case in such terms leads to the conclusion that petitioner has failed to make out his claim of a constitutional violation in requiring him to undergo a unitary trial.

The Court added that "It does no violence to the privilege that a person's choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case." 402 *U. S.* at 213, 91 S. Ct. at 1470, 28 *L. Ed.* 2d at 730. The opinion continues (402 *U. S.* at 215, 91 S. Ct. at 1471, 28 *L. Ed.* 2d at 731) :

"It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. * * * It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. * * * Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify.

Further, a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty."

It is not surprising that the dissenters relied upon *Garrity,* saying that "*Garrity* involved only employment rights." 402 *U. S.* at 240, 91 S. Ct. at 1484, 28 *L. Ed.* 2d at 745. We agree the pressure upon Garrity was much less.

■ From the foregoing review of cases since *Garrity* we conclude that the Fifth Amendment does not bar all compulsion to choose; that a balance must be struck between a legitimate public need and the right to be silent; that *Garrity* seemingly departed from that approach when it failed to decide whether government had a right to call upon its officers to account for their performance in office and thus failed to weigh that public interest against requiring an

officer to choose whether to quit or to waive his privilege of silence. *Garrity* of course has not been overruled with respect to its precise holding, but surely there is reason to doubt it will be extended in any way.

Defendant here does seek to extend the holding of *Garrity*. As we noted earlier, defendant agrees it was a duty of his office to submit the report in question. In effect he asks that *Garrity* be read (1) to excuse nonperformance in office, *i. e.*, the failure to file a required report, and (2) to excuse bad performance in office, *i. e.*, the submission of a false official report. Nothing in *Garrity* warrants either extension.

*Garrity* involved the interrogation of a policeman with respect to prior misconduct. The case did not involve a prosecution for the failure to perform an assigned duty. It would be remarkable if a public official who accepted a bribe, let us say, in connection with the issuance of a license or the making of a tax assessment could omit to record the issuance of the license or the assessment on the plea that, to do so, would link him with that crime. A public official cannot urge his misfeasance or malfeasance in office as a defense to a charge of nonfeasance in office. Surely the Fifth Amendment does not spare an officeholder that dilemma.[2]

---

[2]Having referred to a case involving a reporting statute, we note that none of the cases in that area suggest the Fifth Amendment would excuse a public official from making a report required by a duty of his office. The cases involving reporting statutes are collected in *California v. Byers*, *supra*, 402 *U. S.* at 429–430, 91 S. Ct. at 1538–1539, 29 *L. Ed.* 2d at 18, where the opinions of the Chief Justice and Mr. Justice Harlan point out that the statutes found to offend the Fifth Amendment were designedly beamed at a group of individuals suspected or guilty of criminal activity, to compel them to come forward with proof of their wrongdoing upon the pain of a further criminal liability if they did not do so. Reference was thus made to *Albertson v. SACB*, 382 *U. S.* 70, 86 S. Ct. 194, 15 *L. Ed.* 2d 165 (1965) ; *Marchetti v. United States*, 390 *U. S.* 39, 88 S. Ct. 697, 19 *L. Ed.* 2d 889 (1968) ; *Grosso v. United States*, 390 *U. S.* 62, 88 S. Ct. 709, 19 *L. Ed.* 2d 906 (1968), and *Haynes v. United States*, 390 *U. S.* 85, 88 S. Ct. 722, 19 *L. Ed.* 2d 923 (1968).

Nor is there any basis in *Garrity* for the defendant's other proposition, that the Fifth Amendment afforded him the privilege affirmatively to commit a criminal act. As we have said, *Garrity* forbad the use of the "coerced" statement to prove a prior criminal offense. Here, however, the "coerced" report is itself the criminal event. It is this false report which was the basis of the second charge upon which defendant was convicted, and defendant contends in effect that *Garrity* entitled him to commit that crime in office in order to hold on to his office.

██ The Fifth Amendment privilege is to be silent; it is not a privilege to commit crime. It has consistently been held that the Fifth Amendment privilege does not entitle a witness to commit perjury. The cases are collected in *State v. Williams*, 59 *N. J.* 493, 500 (1971). Accordingly in *United States ex rel. Annunziato v. Deegan*, 440 *F.* 2d 304 (2 Cir. 1971), it was held that although under the cases we have cited, including *Garrity*, the defendant public employee was improperly required to waive his immunity before the grand jury on the threat of the loss of his employment, that compulsion did not excuse perjury in the testimony he gave. The court said (*p.* 306):

> But here appellant was not prosecuted for *past* criminal activity based on what he was forced to reveal about himself; he was prosecuted for the *commission of a crime while testifying.* i. e. perjury. In short, while a public employee may not be put to the Hobson's choice of self-incrimination or unemployment, he is not privileged to resort to the third alternative, i. e., lying. The Supreme Court has squarely so held. United States v. Knox, 396 U. S. 77, 82, [90 S. Ct. 363, 24 L. Ed. 2d 275] (1969).

To the same effect is *People v. Goldman*, 21 *N. Y.* 2d 152, 287 *N. Y. S.* 2d 7, 234 *N. E.* 2d 194 (1967). As the Second Circuit noted in *Deegan*, the appeal in *Goldman* was dismissed for want of substantial federal question seven days after the decisions in *Gardner* and *Uniformed Sanitation Men.* 392 *U. S.* 643, 88 S. Ct. 2280, 20 *L. Ed.* 2d 1346

(1968), reh. denied, 393 *U. S.* 899, 89 S. Ct. 69, 21 *L. Ed.* 2d 186 (1968). See also *People v. Genser,* 250 *Cal. App.* 2d 351, 56 Cal Rptr. 380, 58 *Cal. Rptr.* 290 (1967).

### III

Defendant urges, for the first time before us, that he committed the crime under "duress." This point no doubt was inspired by the reference to duress in *United States v. Knox,* 396 U. S. 77, 90 S. Ct. 363, 24 L. Ed. 2d 275 (1969). It was there held that although on the basis of the Fifth Amendment defendant could have refused to comply with the filing provision of a federal statute, he was not privileged to file a false report and accordingly indictments based on that falsity were valid. The court noted but left open the question whether "If the compulsion was unlawful under Marchetti [which held the Fifth Amendment would justify a failure to file], Knox may have a defense to this prosecution under the traditional doctrine that a person is not criminally responsible for an act committed under duress." 396 *U. S.* 82–83, 90 S. Ct. 367, 24 *L. Ed.* 2d at 280–281.

The defense of "duress" is a matter of State law. We see no connection between that defense and the charge of official misconduct in the filing of a false report, and this for a number of reasons. The first is that there was no compulsion whatever to commit the crime. The compulsion was to tell the truth; no one ordered defendant to file a false report upon a threat of pain if he did not do so. Defendant alone decided upon that course. Next, the compulsion ordinarily required is a well grounded apprehension of death or serious bodily harm which the defendant could not otherwise avoid, and of course defendant here was not so threatened. A person in private employment could hardly defend against a charge of robbery, larceny, embezzlement, or perjury on the ground that his employer directed him to commit the crime on the pain of discharge. It is no less frivolous to say a public officer may make false reports or false

entries or commit perjury because otherwise he might be dismissed from office because of previous misconduct. Indeed defendant's proposition seems to be that the duties of the office he seeks to retain are themselves oppressive and therefore may be breached, or that the criminal code itself constitutes duress which will justify a violation of it. A public officer can avoid this supposed dilemma by quitting, and he should. In these circumstances there is no semblance of a defense that the false report was the product of duress. See generally, 1 *Wharton, Criminal Law & Procedure* (1957) § 123, *pp.* 261–267; 21 *Am. Jur.* 2d, *Criminal Law,* § 100, *p.* 180; annotation, 40 *A. L. R.* 2d 908, 910, 911, 918; *Model Penal Code* §§ 2.09, 3.02 (Proposed Official Draft, 1962); *id.* § 2.09, Comment (Tent. Draft No. 10, 1960).

## IV

■ Finally defendant refers to Rule of Evidence 8(3) and reads it to mean that the trial court was obliged to decide whether the false report was involuntary and therefore inadmissible. The rule deals with confessions. As we have already said, the false report was not a confession of guilt with respect to the failure to file a report involved in the first count of the indictment, and further, if the false report should be thought to have been admitted upon that charge, the error was harmless beyond a reasonable doubt. Insofar as the report was offered to prove the second charge, that defendant filed a false report, the document, as we have said, was a constituent element of the crime rather than a confession of it and therefore its admissibility was not within the cited Rule of Evidence. And, of course, that Rule of Evidence has nothing to do with the defense of duress which defendant projected on this appeal to us.

We find no substance in the other points defendant advanced on his appeal to the Appellate Division.

The judgment of the Appellate Division is reversed and the judgments of conviction are affirmed.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.