**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3449-16T3

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

ARMANDO NOGUIERA,

    Defendant-Respondent.

_____

Submitted September 20, 2017 - Decided October 11, 2018

Before Judges Fuentes and Suter.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-01-0007.

Robert D. Laurino, Acting Essex County Prosecutor, attorney for appellant (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Sciarra & Catrambone, LLC, attorneys for respondent (Charles J. Sciarra, of counsel and on the brief; Deborah Masker Edwards, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

At all times relevant to this case, defendant Armando Noguiera was a Sheriff's Officer with the Essex County Sheriff's Office. On October 5, 2012, John Warnock, a fellow Essex County Sheriff's Officer, allegedly restrained and threatened to sexually assault a woman. The charges against defendant arise from his interactions with Warnock on the night they both encountered the alleged victim. The Essex County Prosecutor's Office (ECPO) charged Warnock with a number of criminal charges related to this incident. On October 9, 2012, and again on December 7, 2012, ECPO investigators questioned defendant about his interactions with Warnock and the alleged victim on the night of October 5, 2012.

Warnock's trial began in September 2014. Both the State and Warnock called defendant as a witness at trial. On December 2, 2014, the jury acquitted Warnock of all of the charges against him. On January 15, 2016, a State Grand Jury indicted defendant on the charge of second degree official misconduct, N.J.S.A. 2C:30-2, third degree perjury, N.J.S.A. 2C:28-1(a), and fourth degree false swearing, N.J.S.A. 2C:28-2(a).[1] To prove these charges, the State intended

---

[1] The indictment incorrectly cites N.J.S.A. 2C:28-1 in the count that describes the fourth degree offense of false swearing.

to introduce into evidence the statements defendant gave to ECPO investigators in the course of the two interviews related to the case against Warnock.[2]

On June 8, 2016, defense counsel filed an omnibus pretrial motion seeking, inter alia, to preclude the State from using the two statements defendant provided in connection with the prosecution of the case against Warnock. Defense counsel argued that the statements are inadmissible because the ECPO investigators did not apprise defendant of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966) and Garrity v. N.J., 385 U.S. 493 (1967) before they questioned him concerning his interactions with Warnock. In an order dated October 6, 2016, the trial judge denied defendant's request to suppress these two statements.

After reviewing court-ordered discovery material provided by the State, defendant again moved to preclude the State from using the statements defendant gave the ECPO investigators. This time, the judge granted defendant's motion. The judge found that at the time they questioned defendant, the investigators had reasonable grounds to consider defendant a "co-conspirator" in the Warnock case. In this light, the judge concluded the

_____

[2] Because defendant is an Essex County Sheriff's Officer, the State transferred venue to Hudson County.

investigators were required to provide defendant with "Garrity warnings" before questioning him about the allegations against Warnock.

In an order dated March 3, 2017, the court suppressed the statements defendant gave to the ECPO investigators on October 9, 2012 and December 7, 2012. By leave granted, the State now appeals arguing defendant was not entitled to Garrity warnings at the time the ECPO investigators interviewed him in connection with their investigation of the allegations against Warnock. We agree and reverse. The following facts developed before the trial court will inform our legal analysis.

I

Defendant began his career as a full-time Sheriff's Officer with the Essex County Sheriff's Office in 2008. Defendant also worked as a part-time security officer for various businesses in the Essex County area. On the night of October 5, 2012, defendant and fellow Sheriff's Officer Richard Rickets were working as security officers at a TGI Friday's restaurant (Friday's restaurant) located in the Township of West Orange. His security shift began at 9:00 p.m. on October 5, and ended at 2:00 a.m. on October 6, 2012. The incident that led to defendant's interactions with Warnock occurred in the parking lot of the Friday's restaurant.

A-3449-16T3

We derive the following facts from the statement a twenty-two-year-old woman provided to ECPO investigators in connection with the criminal charges she filed against Warnock. We identify her as I.R. to protect her privacy. See R. 1:38-3(c)(1).

On the evening of October 5, 2012, I.R. was with a friend in a social club in the Township of West Orange, located near the Friday's restaurant where defendant was working as a security officer. I.R. admitted that she was inebriated when she "got into a fight with a guy which resulted in her getting kicked out of the club." Once outside the club, a "bouncer" escorted her to the other side of the street and off the club's property. She decided to walk to a bus stop "to begin discussing getting rides home." Although not explicitly stated, we infer I.R. discussed this with the woman who originally accompanied her to the club.

At approximately 11:30 p.m., I.R. encountered defendant for the first time when she walked into the Friday's restaurant parking lot. Although he did not produce a badge or other forms of official identification, I.R. claimed defendant said he was a police officer and "offered to give her a ride home." The record is not entirely clear about the sequence of the following events. However, I.R. told the ECPO investigators that she decided to return to the Friday's restaurant

parking lot after she realized her friend had left the area. This time, I.R. encountered defendant and John Warnock, who identified himself as a Sheriffs Officer. According to I.R., she overheard Warnock tell defendant: "you['re] not going to take 'her' home because you will get in trouble." I.R. also alleged that defendant told her Warnock was "his boss and there was nothing he could do about it."

After the passage of certain intervening events that are not relevant to the issues we address here, I.R. accepted Warnock's offer to ostensibly drive her home. I.R. alleged that during the drive, Warnock engaged in conversation with her about personal matters and asked her whether she had a boyfriend. She told him she had a one-year-old child and was not romantically involved with anyone at the time. Warnock allegedly asked I.R. her age and whether she needed money. She told Warnock she was twenty-two years old and all she wanted was to get home. At this point, I.R. alleged that Warnock told her "to take her panties down." She allegedly responded: "why are you asking me that, you're a police officer." Warnock allegedly responded: "take your panties down now or I'll kill you."

I.R. told the ECPO investigators that she became very scared and started to cry while thinking about her infant son. I.R. claimed that after remaining

silent for "a few minutes," she jumped out of Warnock's car, started running and began frantically knocking on every door she found. No one answered. She hid behind some bushes because she was uncertain whether Warnock was following her. She ran out into the middle of the street when she saw a car "containing kids in their 20's drive by her." I.R. told the occupants of the car to call the police because "someone was trying to kill her." Beyond this point, her only recollection is "finding herself in an ambulance where she continued to cry . . . ."

Based on these allegations, a grand jury returned an indictment against Warnock charging him with second degree Official Misconduct, N.J.S.A. 2C:30-2, third degree Criminal Restraint, N.J.S.A. 2C:13-2, third degree Criminal Coercion, N.J.S.A. 2C:13-5, and third degree Terroristic Threats, N.J.S.A. 2C:12-3. ECPO Lieutenants Steve Roberts and Stanley Rosa interviewed defendant on two separate occasions as part of their investigation of the Warnock case. Defendant's two verbatim statements are part of the appellate record.

October 9, 2012 Interview

In this first interview, defendant confirmed that on October 5, 2012, he was working part time at the Friday's restaurant in West Orange, when he saw

7

Warnock come with Jodi Biondi, a Corrections Officer with the Essex County Department of Corrections. Warnock and Biondi stayed in the restaurant until it closed in the early morning hours of October 6, 2012.

Defendant finished his shift at Friday's restaurant at approximately two o'clock in the morning. As he left the restaurant, two women who appeared intoxicated approached him after they left the nightclub located across the street. One of the women left the area shortly thereafter. The other one, later identified as I.R., asked defendant for a ride home. Defendant told I.R. he could not take her home and suggested that she call a taxi. According to defendant, I.R. walked away into the parking lot and attempted to enter a car occupied by three men. Concerned for her safety, defendant claimed he approached the vehicle, identified himself as a Sheriff's Officer, and told her to get out of the car and call a taxi. Defendant explained to the investigators:

> I didn't know if she knew the people [in the car]. It didn't seem like she knew the people. Like, she just jumped into the car.
>
> So, I wanted to make sure that she got out of the vehicle and she sat at the bus stop. I told her that she should get a cab. And eventually she walked into the parking lot. I lost visual contact with her and then I just left and went home.
>
> [(Emphasis added).]

According to defendant, Warnock left the area "a little before" him. When asked to estimate how much time transpired between the point when he left and Warnock's departure, defendant responded: "I couldn't honestly say." When the investigators continued to question him about his interactions with the occupants of the car that I.R. attempted to enter, defendant asked the following questions:

> DEFENDANT: Gentlemen, may I ask what is this about?
>
> LT. ROSA: This is an investigation we're conducting and - -
>
> DEFENDANT: I understand that, but - -
>
> LT. ROBERTS: It involves your part-time employment with your duties as a part-time employee.
>
> DEFENDANT: Okay. Should I have a PBA representative with me at this time? I mean, am I in some kind of trouble?
>
> LT. ROBERTS: Well, not right now. We're just interviewing you as a witness right now.
>
> LT. ROSA: As a witness, you're being interviewed.
>
> . . . .
>
> LT. ROBERTS: Because you clearly told us that you had contact with the intoxicated female.
>
> DEFENDANT: Did something happen to the female?

LT. ROBERTS: Well, we don't know. We're just talking to you right now.

. . . .

DEFENDANT: . . . I understand that [it is an investigation] sir. But there's a reason behind the investigation. And I'm just asking what am I being interrogated about?

LT. ROSA: You're being interviewed . . . There's a difference.

Defendant continued to press the investigators to disclose the underlying basis of their investigation. The record shows the investigators left the interview room to confer privately off the record. The following exchange occurred when the investigators returned to the interview room:

LT. ROSA: We're going to change this up a little bit. Okay?

. . . .

LT. ROBERTS: We know that you had [a] confrontation with [I.R.]. We know that you agreed to take her home.

DEFENDANT: Okay.

LT. ROBERTS: We know that you went to the car with her and removed her from the car.

DEFENDANT: Okay.

LT. ROBERTS: We know that you got off work about 2:05 [a.m.] and you exited the bar.

. . . .

You exited the bar not by yourself.

LT. ROSA: You were with someone. Someone was there when you stopped this girl. Someone was there when you saw the girl in the car. Someone was with you when you told her to leave the car. Now, I think you should get in front of this and tell us who was with you.

LT. ROBERTS: We want straight details. We don't want

. . . .

No more bullshit.

. . . .

LT. ROSA: Who was with you?

DEFENDANT: Can I speak to my PBA rep?

LT. ROSA: Do you want to speak to a PBA rep?

DEFENDANT: I think that - -

LT. ROSA: It's obvious you don't want to talk to us? You don't want to tell us what happened. If that's what you want - -

DEFENDANT: No, no, no.

LT. ROSA: - - then you can have it. Well listen to me. Either you tell us what happened or we're going to

change this whole thing around.  <u>Right now you're a witness</u>.

LT. ROBERTS: <u>Right now you're a witness</u>.

LT. ROSA: We asked . . . you who you were with and who was with you at the time.  And when she went away - - she went away and you went your way.  Did you do something wrong?

DEFENDANT: No.

LT. ROSA: Okay.  Then tell us what happened and stop the bullshit, bro.  Straight and simple, stop this bullshit.  Tell us what happened, who was with you, what you saw.  That's all we want to know right now.  We're telling you, get in front of this right now.  Get it out . . . stop the bullshit.  <u>If you lie about something, you're going to get jammed up for lying</u>.  <u>There's no reason for that.  You did nothing wrong</u>.  All we want is the truth.  Now this is your opportunity to tell us the truth.  Period.  You did nothing wrong, we want the truth about everything.

LT. ROBERTS: From inside the bar, out.

LT. ROSA: And until you went home.  Everything.  This is on you now.  You like your job?

DEFENDANT: I love my job.

LT. ROSA: Tell us the truth.  Just the truth.  <u>You lie, you could lose your job</u>.  Do you want to lose your job for some bullshit, bro?  That you got nothing to do with?  We want the truth.  You can tell us.  Let's start again.  You worked inside?

[(Emphasis added).]

A-3449-16T3

After this exchange, defendant told the investigators a different account of the events that occurred that night. According to defendant, Warnock first entered the Friday's restaurant with a woman whom defendant did not know. When defendant left the restaurant, he saw Warnock outside with two different women, one of whom appeared to be intoxicated. The women told defendant that they were "getting a ride." The intoxicated woman was later identified as I.R. Defendant claimed he told I.R. to go with her friend. When the car came, the two women approached the vehicle together. However, I.R. "was still left behind" when the car left.

I.R. walked over and entered a car that had three male occupants. Defendant and Warnock approached the car, confronted the occupants, and demanded that the intoxicated woman get out of the car. When defendant seemed reluctant to elaborate beyond this point, Lieutenant Rosa pressed him to provide details: "Explain to us. Explain to us. Come on, come on . . . ." Defendant relented and told the investigators that when the occupants of the car asked them "who we were to say that [I.R.] had to exit the vehicle[,]" he and Warnock identified themselves as law enforcement officers. Warnock approached the car first and told I.R. to get out.

13

According to defendant, I.R. walked over to where he was standing and asked him: "[Are] you going to take me home?" Defendant asked her why she did not leave earlier with her friend, but she was allegedly unable to give a clear answer. Based on I.R.'s inebriated condition, he decided it was a "bad idea" to take her home. Defendant claimed that Warnock joined him in recommending to I.R. to call a taxi to take her home. Lieutenant Rosa sensed this was a critical point in the narrative and admonished defendant: "You're doing good so far. Don't mess this . . . whole thing up, my man. Don't start throwing bullshit into this. . . . As this story continues, keep on the path of the truth."

Defendant responded: "I saw her walk into the park - - she went back and forth from the bus stop and then she walked into the parking lot. That was the last I saw [of] her." When Lieutenant Rosa asked "who was in the parking lot?" Defendant stated: "Officer Warnock was heading to his vehicle to go home." Defendant claimed that he and Warnock agreed they could not take her home because I.R. was "too drunk." Defendant also stated that Warnock told him to "just go." As the following statements illustrate, the investigators did not find defendant credible in this respect.

> LT. ROBERTS: [Y]ou mean to tell me you got her out the car and then you all left her in the parking lot? After she was in the car that was - - you considered unsafe, but to leave her in the parking lot at three o'clock in the

morning where she - - where, I'm assuming, you considered she was safe because you left her?

LT. ROSA: You ain't no dummy, kid. You're a veteran, right?

DEFENDANT: Yes.

LT. ROSA: Okay. So, you're not no dummy. This isn't your first rodeo. You're concerned, you were concerned. You had to be concerned. You knew that she was going to be in good hands, that's why you left. I don't think you would have abandoned her. I know you wouldn't have abandoned her.

So, you knew she was in good hands, correct? Yes or no? You knew she was in good hands

LT. ROBERTS: Based on your relationship with Detective Warnock [do] you considered [him] your superior or boss, correct?

LT. ROSA: It's an easy answer. Yes or no?

DEFENDANT: Yes.

LT. ROBERTS: So what happened?

DEFENDANT: They went in the same direction. I don't know if he was going to call her [a] cab or take her home.

LT. ROSA: So, did he [Warnock] assume responsibility, bro [.] Go ahead, go home. I got this.

DEFENDANT: Yes.

A-3449-16T3

Defendant told the investigators that he called Warnock on his way home. Warnock allegedly told him that I.R. was "acting erratic and he left her behind." Defendant told the investigators that his immediate reaction to Warnock's statement was relief. Defendant claimed he suspected I.R. "might have had some allegations toward" Warnock. According to defendant, the telephone conversation he had with Warnock lasted "four to five" minutes. The investigators asked defendant a number of questions concerning the substance of the conversation between him and Warnock. Defendant consistently failed to provide a responsive answer.

Lieutenant Roberts finally said: "We . . . know that you're holding back. Defendant assured the investigators he had been truthful in all of his answers to their questions. Lieutenant Rosa stated: "Which is also a lie. You forget to tell me something and you choose not to tell me something because I didn't ask you, it's a lie. It's going to be a lie and I'm going to - - we're going to prove it, bro." Defendant stated: "All right. I think at this point I do need to see my PBA rep." This prompted the investigators to momentarily leave the interview room.

When the investigators returned to the interview room, they asked defendant if he had anything else to say about this incident "before we close the statement[.] Because once we close it, we're going to find out more." The

16

investigators urged defendant to disclose everything that happened that night between Warnock and I.R, even if it related to events or comments made by Warnock and I.R that were not directly raised by the investigators. In the words of Lieutenant Rosa: "We want it all." Defendant responded: "I just gave it."

### December 7, 2012 Interview

After Lieutenants Rosa and Roberts interrogated Warnock on December 7, 2012, they decided to interview defendant again. Lieutenant Rosa began this second interview by advising defendant "[y]ou are just a witness" in a criminal investigation. Lieutenant Roberts admonished defendant, however, that "if you don't answer our questions truthfully and it's proven that you lied to us, then you'd be subject to penalties by the sheriff's department. Criminal. Okay?" When the investigators asked defendant if he remembered the incident of October 5, 2012 involving Warnock, he responded: "Vaguely, yes." The investigators asked defendant a series of questions that revisited many of the topics covered in the first interview. In the course of this exchange, defendant clarified certain details about Warnock's interactions with I.R. that night.

According to defendant, Warnock was the first to approach I.R. and identify himself as a Sheriff's Officer. Defendant was wearing his Sheriff's Officer's uniform; Warnock was in plain clothes. Defendant claimed Warnock

had a good-faith belief that I.R. did not know the men who offered to drive her home. Warnock thus concluded it was not wise for her to leave with these men, especially in light of her intoxicated state. Defendant and Warnock suggested to I.R. to return to the club "or call a cab." For the first time in the course of this investigation, defendant claimed that I.R. offered him money to take her home. When the investigators asked defendant if he agreed to take I.R. home, defendant responded: "I believe I might have said that, yes, I'd be able to." Again, for the first time in this investigation, defendant revealed that I.R.'s friend actually sat inside his parked car. When pressed about whether both I.R. and her friend were inside his vehicle, defendant stated: "Her friend definitely was. I don't recall if [I.R. was] or not."

Defendant told the investigators that Warnock advised him against taking I.R. home, and "I took his advice." According to defendant, Warnock planned to call a taxi to take her home. Once again, when pressed to provide details, defendant told the investigators that neither of them made any effort to call a taxi. Warnock merely told defendant to go because he would "take care of it." As he drove away, defendant saw Warnock walking to his vehicle with I.R. walking six to ten feet behind him. According to defendant, this encounter between Warnock and I.R. lasted approximately one hour. As he drove home,

defendant said he called Warnock because he had "a bad feeling about leaving him alone in that situation." When the investigators asked him why he did not stay with Warnock until I.R. could find a way to get home safely, defendant responded: "Lapse of judgment."

Defendant told the investigators that when he reached Warnock on the cellphone, Warnock told him: "I left that batty bitch there." When the investigators asked him to explain what made I.R. a "batty bitch," defendant responded: "I'm trying to think of a better word to describe it. For example, the fact that she needed a ride to Clifton, Paterson, [the State of] Ohio. She was definitely, like, very drunk, and irrational - - irrational is the word." Defendant claimed his cellphone conversation with Warnock lasted "only, like, two minutes." He also told the investigators that he had not spoken to Warnock "since then until now." However, when asked whether he called Warnock the day after the incident, defendant responded: "I could have." When pressed to give a "yes or no" answer, defendant merely repeated: "I could have."

Before the interview ended, defendant admitted to Lieutenant Rosa that he had spoken to Warnock "minutes before" the second interview to let him know "I was getting called in." When Lieutenant Roberts asked defendant "why would [he] reach out" to Warnock if he did not know the reason he was being

summoned to appear, defendant responded: "He's a friend of mine. . . . He's a good enough friend that I would call him for advice."

<u>Interrogation[3] of John Warnock</u>

Lieutenants Rosa and Roberts interrogated Warnock on December 7, 2012, before they interviewed defendant for a second time. They advised Warnock that the subject of the interrogation concerned what occurred on the night of October 5, 2012, into the early morning hours of October 6, 2012. Warnock told the investigators that sometime after ten o'clock on the evening of October 5, 2012, he received a text message from Jodi Biondi about getting together for a drink. Biondi suggested they meet at the Friday's restaurant in West Orange. Warnock and Binodi left the Friday's restaurant at approximately 2:30 a.m. on October 6, 2012.

According to Warnock, as he and defendant were talking in the Friday's parking lot, "we observed two girls coming . . . from the nightclub across the street . . . [both of whom] were drunk." The two women were also "trying to get a ride from whoever they can get a ride from." Warnock told the investigators

---

[3] We use the word "interrogation" because by this time I.R. had identified Warnock as the man from whose car she fled in the early morning of hours of October 6, 2012, after he told her "to take her panties down." Stated differently, the ECPO considered Warnock a suspect in a crime, not a witness. Warnock was represented by counsel at the time. His attorney was present during the entire interrogation.

that out of concern for their safety, he asked the women: "do you want a cab?" One of the women walked away and "started talking to some guy. Yells over, I know him. He's giving me a ride home. I'll see you later and takes off." The woman who remained was later identified as I.R.

Warnock corroborated defendant's account of what transpired with respect to I.R. He told the investigators about I.R.'s attempts to get in a car with three men she did not know. He claimed that when Biondi called him to confirm she was home, he told her: "I'm still here, you know, trying to get this girl home. We're still - - we're still dealing with this." We infer that by using the pronoun "we," Warnock intended to convey that Biondi was aware defendant was helping him to get I.R. safely home.

Warnock told the investigators that when he saw I.R. walk over to the bus stop, he told her: "Get away from the bus stop. It's not safe for you." He then asked her if she needed a phone or money, or "whatever, you know, I'll give you the money. It's no big deal." According to Warnock, I.R. responded: "I'm not sleeping with you because you're giving me money for a cab." Warnock said he was "perplexed" by I.R.'s response. He told the investigators that he made clear to I.R. that he had not said anything about "sleeping" with her. Warnock also claimed that when defendant "looked" at him, he "waived him off."

21

Warnock believed he had done enough to help I.R., and started to walk to where his truck was parked. However, when he turned around, he noticed I.R. was following him saying: "I need a ride, I need a ride." He told the investigators that he made clear to I.R. that she was not getting in his truck. "You're not coming with me . . . I'll give you money for a cab, I'll call a ride, husband, boyfriend, whoever you need me to call, I'll call for you. But you're not coming in my car." At one point, Warnock said "another car pulled up, said something. [I.R.] walked over. I got into my truck - - I was already in my truck at this point and I left." Warnock emphasized that I.R. never was inside his truck.

Of particular relevance here, Warnock told the investigators that during his conversation with I.R., he purposely called Biondi so she would hear "all the tirades and – and everything that was going on like, the way [I.R.] was acting." Warnock confirmed that defendant called him at approximately 3:15 a.m. and asked him how he "made out[.]" Warnock told the investigators: "I told him straight out, I left this girl. She was crazy. She was nuts. There's something wrong with her. . . . I offered [her] every aspect and avenue I could to help her. I said, I left her."

## Defendant's Trial Testimony for the State

On September 18, 2014, defendant testified as a witness for the State in the case against Warnock. In the course of his direct testimony, defendant largely repeated what he told the ECPO investigators during his two interviews in October and December 2012. Corrections Officer Jodi Biondi testified she interacted with I.R. outside the parking lot when she left Friday's with Warnock. Biondi specifically noticed I.R.'s "distinct Hispanic accent." Biondi testified that I.R. asked her for the telephone number of a taxi, but she was not able to provide her with one.

When Biondi left Friday's, Warnock, defendant, I.R. and the other woman I.R. was with that night were still in the restaurant's parking lot. Biondi testified it took her between fifteen to twenty minutes to drive home. She called Warnock when she arrived at approximately three o'clock in the morning, "[j]ust to let him know that I was home okay." She characterized the call "as a short conversation."

At 3:02 a.m., Biondi received a call from Warnock's cellphone that sounded to her like an unintentional "pocket dial."[4] She said "hello" a number of times, but did not get a response. Biondi testified she "stayed on just to be I

---

[4] Biondi testified she knew it was Warnock's cellphone because she had saved his phone number on her contact list.

guess curious to see if anything was happening." She heard the voice of "a female" with a "distinct accent that I heard earlier in the night." Biondi testified it was "the Hispanic accent from the parking lot." However, "[t]he only thing that [Biondi] could make out . . . was, why would you want to hurt me, why could you want to kill me. And then I heard [Warnock] say, take down your panties, and then the phone dropped[.]"

During the two 2012 interviews, defendant did not mention anything about Warnock's "pocket dial" phone call to Biondi at 3:02 a.m. In his testimony as a witness for the State at Warnock's trial, defendant did not say he was with Warnock at the time of the 3:02 a.m. phone call to Biondi.

<u>Defendant's Testimony as a Defense Witness at Warnock's Trial</u>

On September 24, 2014, Warnock called defendant as a witness for the defense. On direct examination, Warnock's counsel asked defendant the following questions:

> Q. Now, was there a point in time when you were at the scene that [Warnock] dialed a phone number on his cell phone?
>
> A. Yes, sir.
>
> Q. Did he tell you who he was dialing?
>
> A. Yes, sir.

24

Q. Who was it?

A. I don't remember the name, sir.

Q. If I said Jodi Biondi, would that refresh your recollection?

A. That sounds accurate, yes sir.

. . . .

Q. Are you positive in West Orange he was dialing in front of you?

A. Yes sir.

. . . .

Q. So he's dialing definitely Jodi Biondi in West Orange at 3:02, right?

A. Yes, sir.

Q. Any doubt about in your mind?

A. No, sir.

Q. Why didn't you say that when you first testified before these 14 people?[5]

A. I was told not to, sir.

Q. Who told you not to say that?

A. The prosecutor, sir.

---

[5] The "14 people" was a reference to the jury.

  A-3449-16T3

On cross-examination, the prosecutor confronted defendant with the transcriptions of the two interviews conducted by the two ECPO investigators. Defendant confirmed that the investigators admonished him "to always tell the truth." However, defendant claimed that at the pretrial interview the prosecutor conducted before he testified as a witness for the State, he told the prosecutor: "I recall a phone call, should I mention it. You [addressing the prosecutor directly] stated, no, that is hearsay. If you're asked about it, then say it, but if not, don't mention it."

Defendant also conceded he did not mention this phone call in either one of the statements he gave to the ECPO investigators in October and December 2012. The prosecutor again asked defendant to recount the details of his encounter with I.R. and his interactions with Warnock when the latter allegedly called Biondi. Defendant testified he specifically remembered seeing Warnock "[pull] out his [cell] phone . . . and [dial] a number. I asked him what are you doing, he says I'm dialing Jodi Biondi - - obviously he didn't say it that way. I think he said Jodi. And I was like, for what? He's like, just to cover our ass." Defendant's testimony in this respect specifically and directly corroborated Warnock's testimony on direct examination.

A-3449-16T3

Telephone records of defendant's cellular phone reflect that at 2:53 a.m., on October 6, 2012, defendant's cellphone was in communication with a cell tower in the Township of Montville in Morris County. At 3:11 a.m. on October 6, 2012, cellphone records reflect that defendant's cellphone was in communication with a cell tower in Jefferson Township, also in Morris County; and at 3:21 a.m., the communication shifted to Sparta Township in Sussex County. Phone records of Warnock's cellular phone indicate that at 3:02 a.m., Warnock's cellphone was in communication with cell towers in East Orange City and the Township of Nutley; both of these municipalities are in Essex County. At 3:11 a.m. when defendant called Warnock, the cell tower data places Warnock in the Lyndhurst/Belleville area and places defendant in Jefferson Township. The data support the State's argument that defendant and Warnock could not have been together at 3:02 a.m. on October 6, 2012. The State attempted to use the report documenting the cell tower analysis during defendant's cross-examination at Warnock's trial. The judge denied the State's application.

II

The State argues the trial judge erred in granting defendant's second motion to suppress the two statements defendant gave the ECPO investigators.

In reviewing the grant or denial of a motion to suppress, this court must defer to the factual findings of the trial court "so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015) (citing State v. Gamble, 218 N.J. 412, 424 (2014); see also State v. Elders, 192 N.J. 224, 243 (2007)). This standard of review is predicated on the unique opportunity the motion judge has "to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). Our authority to disregard a motion judge's factual findings is limited to those rare cases in which the record shows the judge's findings of fact "are clearly mistaken." Id. at 162. However, we review the motion judge's legal determinations de novo. State v. Hagans, 233 N.J. 30, 38 (2018).

Defendant filed two motions to suppress the two statements he gave to the ECPO investigators. The first motion to suppress was argued on June 22, 2016, and denied by the judge on September 22, 2016. After reviewing the evidence and considering the argument of counsel, the motion judge found the ECPO did not consider defendant complicit in any way in the criminal allegations I.R. made against Warnock. The judge found I.R. alleged Warnock was the only person who lured her into his car with the intent to sexually assault her, and

threatened her with bodily harm after she refused to submit to his sexual advances. The judge also did not find any evidence that implicated defendant in any wrongdoing at the time the investigators interviewed him in October and December 2012.

The judge also addressed defendant's unanticipated alibi testimony at Warnock's trial:

> At the time there would have also been no reason to believe that this [d]efendant, Mr. Nogueira, would in any way have been called as an alibi witness or other type of exculpatory witness on behalf of [Warnock] because the evidence that they had at that time was that the phone records of Mr. Warnock suggested that he was in one location and the phone records of Mr. Nogueira suggested he was in a different location. And further, the first interview of Mr. Nogueira in no way discussed the phone conversation surrounding the victim or the allegations contained therein by the witness that there was a butt dial or actual phone conversation wherein [Warnock] was attempting to cover his own butt and Mr. Nogueira was present and witnessed that information.

The judge thereafter granted defendant's motion to compel the State to produce copies of all correspondence, emails, notes and conversations or reports related to any assistant prosecutor, including the prosecutor who tried the case against Warnock. In short, the judge ordered the State to deliver to defense counsel "anything that had to do with Mr. Nogueira's interview," notes that were

made after his testimony at the Warnock trial, and notes or emails exchanged "with regards to how [the State] intended to proceed" based on defendant's testimony at Warnock's trial.

On January 27, 2017, defendant filed a motion to dismiss the indictment and suppress the statements he made to the ECPO investigators. The judge heard argument on the motion on March 3, 2017. This time, the judge focused on the tone of the investigators' questions and interactions with defendant during the interviews and found that

> when Mr. Nogueira was brought into the station, at that time, he may not have been the main target of the investigation, but it was clear that they had questions . . . when they brought him in, whether he was going to be part of the target of the investigation.
>
> Anyone could have seen that it was a possibility that depending on what Mr. Nogueira said, at that particular time and moment, that he, in fact, could have been a co-conspirator.

Based on this reinterpretation of defendant's statements, the motion judge concluded that "it is clear to the [c]ourt, or at least the impression of this [c]ourt that Garrity warnings should have attached because, as indicated by the prosecutor, they had no idea what Mr. Nogueira was going to say during the course of that interview, whether he was going to inculpate himself, or anything of that nature."

30

We start our analysis with an examination of the relevant legal principles. In Garrity v. New Jersey, the United States Supreme Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and . . . it extends to all, whether they are policemen or other members of our body politic." Garrity v. New Jersey, 385 U.S. 493, 500 (1967).

In State v. Lacaillade, 266 N.J. Super. 522 (App. Div. 1993), this court reviewed the application of the Supreme Court's holding in Garrity in the context of an investigation of a police officer who was accused of misrepresenting the circumstances that led to the discharge of his service weapon. Id. at 525-26. Writing for the panel, Judge Brody explained that pursuant to Garrity:

> [l]aw enforcement officers may not attach a penalty to the exercise of that right by a public employee through the threat of dismissal. Thus where a police officer's answers to police questioning are coerced by the threat of removal from office, the answers are not admissible unless the officer waives his or her constitutional right to remain silent.
>
> [Id. at 528.]

After reviewing the record of the internal affairs investigation, Judge Brody explained that the invocation of the protections available under Garrity

depend upon whether the record shows evidence of what "the consequence to [the] defendant [was] of disobeying the order to answer by exercising his constitutional right to remain silent." Id. at 529. In Lacaillade, we held that "[e]ven if there were evidence that [the police officer] subjectively believed that he would be removed if he refused to answer, there is no evidence that such a belief would have been reasonable." Ibid.

Stated differently, Garrity prevents internal affairs investigators from coercing police officers into giving incriminating statements by threatening them with the termination of employment. However, Garrity does not immunize a police officer from the consequences of committing a subsequent crime. State v. Falco, 60 N.J. 570, 585 (1972). In Falco, the defendant, a Newark Police Detective, was convicted on two counts of official misconduct in office. Id. at 573. The defendant failed to file a report involving a barroom brawl at a local tavern and later misrepresented he was in the tavern at the time of the brawl. Id. at 574. On direct appeal, this court reversed the defendant's conviction based on Garrity, holding that if the defendant filed the false report "because he feared he would lose his job if he refused to do so, then the report was not admissible in evidence. . . ." Id. at 574-75.

Our Supreme Court reversed this court's decision. Writing for the Court in Falco, Chief Justice Weintraub explained:

> Garrity involved the interrogation of a policeman with respect to prior misconduct. The case did not involve a prosecution for the failure to perform an assigned duty. It would be remarkable if a public official who accepted a bribe, let us say, in connection with the issuance of a license or the making of a tax assessment could omit to record the issuance of the license or the assessment on the plea that, to do so, would link him with that crime. A public official cannot urge his misfeasance or malfeasance in office as a defense to a charge of nonfeasance in office. Surely the Fifth Amendment does not spare an officeholder that dilemma.
>
> Nor is there any basis in Garrity for the defendant's other proposition, that the Fifth Amendment afforded him the privilege affirmatively to commit a criminal act. As we have said, Garrity forbad the use of the "coerced" statement to prove a prior criminal offense. Here, however, the "coerced" report is itself the criminal event. It is this false report which was the basis of the second charge upon which defendant was convicted, and defendant contends in effect that Garrity entitled him to commit that crime in office in order to hold on to his office. The Fifth Amendment privilege is to be silent; it is not a privilege to commit crime. It has consistently been held that the Fifth Amendment privilege does not entitle a witness to commit perjury.
>
> [Id. at 584-85; see also State v. Williams, 59 N.J. 493, 500 (1971).]

Here, defendant had an affirmative obligation as a law enforcement officer to cooperate with the investigation of allegations of criminal conduct by

Warnock. Defendant had a duty to disclose to the investigators everything he knew of Warnock's interactions with I.R. candidly, forthrightly, and completely. If he intentionally misrepresented his location at 3:02 a.m. on October 6, 2012, to provide Warnock with a false alibi, he must face the legal consequences of that decision. Garrity is not a license for law enforcement officers to commit future crimes. Here, the motion judge misapplied the Court's holding in Garrity to dismiss the indictment against defendant.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3449-16T3